**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**
_____ X

IRWIN FRANCHISE CAPITAL CORPORATION,      :
                                          : **ANSWER. JURY DEMAND**
                          Plaintiff,      : **AND AMENDED COUNTERCLAIM**
                                          :
            v.                            :
                                          : Civil Action No.: **07 CIV 3785**
WINDRAM ENTERPRISES, INC.,                : (Judge Conner)
                                          :
                          Defendant.      :
                                          :
_____ X :

     Defendant, Windram Enterprises, Inc. as and for its Answer to Plaintiff's Complaint alleges and says:

### IN ANSWER TO THE FIRST CAUSE OF ACTION FOR BREACH OF CONTRACT

    1.    Defendant denies knowledge and information sufficient to form a belief as to the truth of the allegations contained in paragraph 1 of the First Cause of Action.

    2.    Defendant denies in the form alleged the allegations contained in paragraph 2 of the First Cause of Action.

    3.    Defendant denies in the form alleged the allegations contained in paragraph 3 of the First Cause of Action and further asserts that the document or documents referenced therein are written materials that speak for themselves.

    4.    Defendant denies the allegations contained in paragraph 4 of the First Cause of Action as these allegations assert a legal conclusion and all questions of law are respectfully referred to this Honorable Court.

    5.    Defendant denies knowledge sufficient to form a belief as to the truth of the allegations contained in paragraph 5 of the First Cause of Action.

    6.    Defendant denies the allegations contained in paragraphs 6, 7, 8, 10, 11 and 12 of the First Cause of Action as the allegations assert a legal conclusion and all questions of law are referred to this Honorable Court and, further, the allegations refer to a document or documents that are written materials that speak for themselves.

    7.    Defendant denies the allegations in paragraphs 9, 14 and 16 of the First Cause of Action.

8.      Except to admit that Defendant confirmed its decision to not proceed due to the various wrongs committed by the Plaintiff as are more fully laid out in the Counterclaim, the allegations of paragraph 13 of the First Cause of Action are denied.

9.      Except to admit a demand for payment was made, Defendant denies the allegations contained in paragraph 15 of the First Cause of Action.

### AS AND FOR A FIRST AFFIRMATIVE DEFENSE

Upon information and belief, that whatever damages the Plaintiff may have sustained at the time and place mentioned in the Complaint same were caused in whole or in part by the culpable conduct of said Plaintiff or the risks were assumed by Plaintiff.  The amount of damages recovered, if any, shall therefore be diminished in the proportion to which said culpable conduct attributable to Plaintiff bears to the culpable conduct which caused said injuries.

### AS AND FOR A SECOND AFFIRMATIVE DEFENSE

Plaintiff's Complaint fails to state a claim for relief and the within action should be dismissed under F.R.C.P. 12(b)(6).

### AS AND FOR A THIRD AFFIRMATIVE DEFENSE

The Complaint is barred by the doctrine of estoppel.

### AS AND FOR A FOURTH AFFIRMATIVE DEFENSE

The Complaint is barred by the doctrine of waiver.

### AS AND FOR A FIFTH AFFIRMATIVE DEFENSE

The Complaint is barred or Plaintiffs claims are diminished in whole or in part by Plaintiff's failure to mitigate damages.

### AS AND FOR A SIXTH AFFIRMATIVE DEFENSE

The Complaint is barred or Plaintiff's claims are diminished in whole or in part by the doctrine of novation.

### AS AND FOR A SEVENTH AFFIRMATIVE DEFENSE

The Complaint is barred or Plaintiff's claims are diminished in whole or in part by the doctrine of accord and satisfaction.

2

## AS AND FOR AN EIGHTH AFFIRMATIVE DEFENSE

The complained of occurrence was caused, in whole or in part, by third parties, over whom the Defendant has no control.

## AS AND FOR A NINTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred in whole or in part by the doctrine of avoidable consequences.

## AS AND FOR A TENTH AFFIRMATIVE DEFENSE

Without admitting liability, which is steadfastly denied, Plaintiff's damages are barred or diminished by the doctrine of set off.

## AS AND FOR AN ELEVENTH AFFIRMATIVE DEFENSE

Plaintiff has not sustained any incidental or consequential damages. Alternatively, Plaintiff's recovery of incidental or consequential damages is barred as a matter of law.

**WHEREFORE**, Defendant demands judgment dismissing the Complaint together with the costs and disbursements of this action, and reasonable attorney's fees.

## JURY DEMAND

Plaintiff hereby demands a jury trial on all issues so triable pursuant to F.R.C.P. 38.

## AMENDED COUNTERCLAIM

Defendant, Windram Enterprises, Inc., as and for its Amended Counterclaim against Plaintiff, Irwin Franchise Capital Corporation, alleges and says:

## FACTS COMMON TO ALL COUNTS

A.    **Parties and Principal Players.**

1.    Defendant/Counterclaimant, Windram Enterprises, Inc. (hereinafter referred to as "Windram") is a New York Corporation having its principal office located in Pawling, New York. Windram, trough its affiliates, operates over a dozen Kentucky Fried Chicken ("KFC") franchise restaurants in New York and Connecticut.

2.    The president of Windram is Arthur Windram.

3.    Plaintiff, Irwin Franchise Capital Corporation (hereinafter referred to as "Irwin") is, upon information and belief, an Indiana Corporation with its principal place of business at 10 Paragon Drive, Montvale, New Jersey.

3

4       At all times relevant, and with the knowledge and acquiescence of Irwin, Charles (Chuck) Fletcher ("Fletcher") held himself out as a marketing vice president of Irwin.

5.      Each of Fletcher's actions were undertaken with the knowledge and consent of Irwin.

6.      As the principal of Fletcher, Irwin is directly liable for all of Fletcher's actions and undertakings.

7.      Unless stated otherwise, all communications between Irwin and Windram were between Fletcher and Arthur Windram.

**B.    Irwin's Claims of Specialized Knowledge and Unique Expertise in Franchise Restaurant Financing and Windram's Reasonable Reliance Thereon.**

8.      Irwin, as its name denotes, specializes in providing financing specifically to franchisees with a special emphasis on restaurant franchises.

9.      Fletcher repeatedly, and on too numerous of occasions over a several year period to set forth separately, told Arthur Windram that Irwin possesses unique and specialized expertise in the financing for franchised restaurants, was customer orientated and could address all of Windram's financing needs.

10.     The representations to Windram concerning Irwin's unique specialized expertise and customer orientation were also made by Irwin at various trade shows and other venues.

11.     The representations to Windram concerning Irwin's unique specialized expertise and customer orientation were also made by Irwin through its website.

12.     The representations by Fletcher made over several years to Arthur Windram mirrored those on Irwin's web site and those made by Irwin at trade shows.

13.     Annexed hereto as Exhibit "A" is a true and accurate copy of Irwin's home page from its website and annexed hereto as Exhibit "B" is a true and accurate copy of the web pages from Irwin's website under the tab "Services".

14.     As boasted on its website, and as reiterated on numerous occasions by Fletcher to Arthur Windram, Irwin claims it has "more than just competitive rates. We have a keen understanding of franchise restaurant business that comes from decades spent providing franchised restaurant financing." (Exhibit A, page 1, first full paragraph).

4

15.    In its website, and through Fletcher, Irwin professed to Windram it "is focused on the franchise restaurant industry" (Exhibit B, Page 1, first full sentence), that it "is focused singularly on the franchise restaurant industry"(Exhibit B, Page 3, second sentence beneath heading "Why Irwin Franchise Capitol Corporation?") and that its "staff does not need time to learn about your business. It is their area of expertise". (Exhibit B, Page 3, second full paragraph beneath heading "Why Irwin Franchise Capitol Corporation?").

16.    As to being customer oriented, Fletcher in his dealings with Arthur Windram, and Irwin through its website, proclaimed to Windram that commitments "generally come with a six month window within which to close". (Exhibit B, page 1, last line). However, where time is of the essence, Irwin, both on its website and through Fletcher to Arthur Windram, told Windram "Irwin can work with you to close many loans within two to four weeks. Real estate loans typically require up to eight weeks to close due to the more extensive documentation process." (Exhibit B, page 2, second and third full sentences on page). The two to four week time period, Irwin said, is typical for "equipment and leasehold" transactions. (Exhibit B, page 3, first bullet point beneath heading "What does it take to close a loan?").

17.    Irwin held itself out to Windram as possessing specialized knowledge, skill and a unique expertise in the field of franchise restaurant financing.

18.    Windram reasonably relied upon these and other representations and did so to its detriment.

**C.    Irwin Commences a Communication Campaign Calculated to Induce Windram's Reliance and to Obtain Substantial Business and Revenue from Windram.**

19.    In or about 2003, Irwin began a campaign to solicit business from Windram.

20.    Toward that end, Irwin sought out Windram in order to entice Windram to do business with Irwin.

21.    The principal architect of this communication campaign designed to induce a business relationship with Irwin was Fletcher.

22.    Over the course of three years, Fletcher, through repeated solicitations, came to understand that Windram's then current financing was provided through G.E. Capital.

23.    Fletcher, on behalf of Irwin, sought to position Irwin as a better financing choice for

5

Windram than G.E. Capital. To do so Fletcher, repeatedly throughout this three year period told Arthur Windram how Irwin's specialized knowledge and expertise in restaurant franchise financing and its unique and specialized expertise in this area, made Irwin more readily able to meet the needs and requirements of Windram.

24.    These representations were made over the phone, in person and at various trade shows attend by Arthur Windram and Fletcher.

25.    In or about 2006, Windram, as a KFC Franchisee, was obligated under its franchise agreement to undertake substantial store retrofit/upgrades.

26.    Knowledgeable of the requirement for KFC store refurbishment, Fletcher and Irwin ramped up their communication campaign with Windram and did so in a designed calculated attempt to induce a transaction between Irwin and Windram.

27.    Windram was then in the market for in excess of $10 Million to refinance existing debt and to complete needed renovations to its restaurants.

28.    It was also necessary for Windram to conclude any financing transaction on or before March 31, 2007.

29.    Beginning in or about the fall of 2006, Fletcher on behalf of Irwin put a full court press on for purposes of securing Windram's financing business. In September of that year, in various conversations with Arthur Windram, Fletcher, on behalf of Irwin, emphasized that Irwin's unique and specialized expertise allowed it to project a closing date of on or before March 31, 2007.

30.    To further buttress its argument of being able to meet Windram's financing requirements and to meet a closing date of on or before March 31, 2007, Irwin, through Fletcher, issued a "proposal" dated December 20, 2006 , a true and accurate copy of the proposal is annexed hereto as Exhibit "C". In that document, Fletcher, on behalf of Irwin, at page 4 under "closing date" stated that "closing date of the Loan shall occur no later than March 15, 2007 ("outside date")."

31.    Windram, in reliance on Irwin's repeated representations made by Fletcher, along with those at trade shows and through Irwin's web site, that it had unique and specialized expertise in restaurant franchise financing such that it was able to meet the required funding sums and could project a closing date to meet Windram's requirements, decided to proceed through Irwin. Such reliance was

6

reasonable and ultimately proved detrimental to Windram.

32.     The letter of December 20, 2006 at page 5, required a proposal fee of $30,000.00.

33.     In a telephone conversation, had on or about December 20, 2006, Fletcher, on behalf of Irwin, advised Arthur Windram that the proposal was erroneous in that the sum should be $40,000.00.

34.     In reliance upon Irwin's communication campaign, its purported expertise and specialized knowledge, and the assurance of a closing on or before March 31, 2007 made orally and in writing, Windram paid $40,000.00 to Irwin. This payment and reliance on Irwin's alleged expertise proved detrimental to Irwin.

35.     Windram's financing, as outlined in the proposal, was substantial being in excess of $10 Million. The size of the financing represented a significant coup for Irwin. Indeed, of the items for Latest News on its current home page (Exhibit A) the proposed deal with Windram exceeds all those listed. Therefore, from a purely marketing standpoint, Irwin wanted to have Windram's business.

36.     Not only was it sizeable and important to Irwin, but it represented for Irwin substantial fee income and income from interest. Obtaining this loan from Windram was both financially lucrative for Irwin, and represented a sizeable feather in Irwin's cap as being "focused singularly on the franchise restaurant industry."(Exhibit B, Page 3, second sentence beneath heading "Why Irwin Franchise Capital Corporation?"). Irwin is boastful concerning its financing process and a $10 Million deal would be significant. Its website homepage (Exhibit A) states under Latest News that since late 2001 it originated more than $1 Billion in new loans. The Windram$10 Million proposal represents 1% of that total, and.6% of its total for anyone year.

37.     Therefore, Irwin had an extreme incentive to procure Windram's business, so much so that it intentionally chose to make repeated misrepresentations.

38.     In fact, Irwin was singularly focused on the benefit it could gain from obtaining the business, so much so it failed to recognize the practical problem posed by its promise to close by March 2007.

39.     The Windram financing required a great deal of operational dexterity as the collateral package was complex, consisting of, among other collateral, eight leasehold mortgages.

40.     As its name implies, a leasehold mortgage is a lien not against the real estate per se, but

7

against the tenant's estate, i.e. the leasehold estate.  Obtaining leasehold mortgages is a time consuming affair. It necessarily requires that the landlord consent to the mortgage.  Most often there are other interested parties.  Typically, the landlord has an outstanding mortgage.  This requires that both the landlord – and its lender – consent to the leasehold mortgage and the form of documentation.  Thus there are four parties usually involved in such a scenario, (1) the tenant/borrower, (2) the tenant/borrower's lender, (3) the landlord and (4)  the landlord's lender.  In addition, each typically is represented by separate counsel, and usually the parties are spread throughout the United States.  Coordination of all these disparate interests and persons is time consuming in effecting one leasehold mortgage, let alone the eight leasehold mortgages under Windram's financing.

41.     Irwin knew, or based on its espoused sophistication as a franchise restaurant financier, should have known, of the practical and time consuming nature of obtaining leasehold mortgages.

42.     Irwin also knew because repeatedly it was told by Arthur Windram to Fletcher, throughout January 2007 in several phone conversations, that to close by March work had to commence immediately.

43.     Yet despite such knowledge, and despite it having had the benefit of Windram's $40,000 for over a month, as of January 2007 Irwin had done nothing to commence the process.

**D.     Irwin Perpetrates a Bait and Switch.**

44.     By the mid part of January 2007, with no action having been undertaken by Irwin, Windram grew uneasy.  It communicated its concern to Irwin via a conversation between Arthur Windram to Fletcher.  Toward the latter part of that month, Fletcher and one Lloyd Droller, an executive with Irwin, visited Arthur Windram in order to allay Windram's concerns.  As a result of that meeting, Irwin represented it would begin immediate action on the loan proposal even though a commitment letter had not issued, and both Fletcher and Lloyd Droller reiterated that a closing date of March 2007 was entirely feasible.  To memorialize that agreement, a letter was sent by Irwin to Windram, authored by its senior vice president of documentation and closing, Bernice H. Carr, dated January 22, 2007, a true and accurate copy of which is annexed hereto as Exhibit "D".  That letter stated that the processing of the loan under the December 20th proposal would commence immediately even prior to approval and issuance of a commitment letter.

8

45.     By all accounts, the letter annexed hereto as Exhibit D is a form letter.  Indeed, it states that the processing will begin upon receipt of the "proposal fee" yet, as set out in paragraph 34 above the proposal fee was paid in the prior month of December 2006.

46.     The letter annexed hereto as Exhibit D is further remarkable as it states that processing "an acquisition loan is time consuming".  This was not an acquisition loan, rather was a refinance.

47.     Most notably, the letter annexed hereto as Exhibit D is conclusive proof that Irwin was making material misrepresentations regarding a closing on or before March 31, 2007.  After all, the letter annexed hereto as Exhibit D proves that Irwin has the knowledge and capacity to commence documentation of a loan in advance of issuing a commitment.  Yet despite such capability, it waited one full month to even suggest that it was feasible to begin loan documentation in advance of a commitment, and did so only after Windram expressed its concern that Irwin could not meet the March deadline.  If Irwin truly intended to meet a March deadline it would have issued the type of letter as Exhibit D not on January 22nd, but on December 22nd.  Its failure to do so proves that Irwin never truly intended to close before March 2007.

48.     Indeed the letter annexed hereto as Exhibit D illustrates that Irwin is knowledgeable of the fact there may be a lag between a proposal and an approval which, to expedite a closing, requires action to be taken up front.  Yet over one month transpired between the date of the proposal and the date of the letter annexed hereto as Exhibit D.  All the while no action was taken.  This was in spite of the fact that Fletcher, on behalf of Irwin, continued to state to Arthur Windram the closing would occur before the end of March.

49.     Other facts bear out that Irwin fraudulently represented a closing would occur by March 2007.

50.     Within four days of the date of the letter annexed hereto as Exhibit D, on Friday January 26, 2007, Fletcher had a telephone call  Windram's attorney John Klarl.  In that phone call, Fletcher, on behalf of Irwin, again reiterated a closing date of March 2007.  Fletcher acknowledged that in order to meet such an aggressive date immediate action needed to be taken.

51.     To help its own cause, Windram, on January 29, 2007, overnighted lease information to Fletcher whom, in an e-mail dated Tuesday, January 30, 2007 confirmed receipt.  By February 2nd, John

9

Klarl indicated there were only two lease packages missing. A true and accurate copy of these e-mails are annexed hereto as Exhibit "E".

52.     Over one week later, on February 8, 2007, a commitment letter issued. A true and accurate copy of the February 8, 2007 commitment letter is annexed hereto as Exhibit "F". On that date, and for the first time, Ms. Christine Currens, appeared in the transaction. Ms. Currens was to act as the closing coordinator of Irwin for the deal.

53.     Despite assurances to the contrary, having had Windram's $40,000 for over seven weeks, having had the leasehold information for more than a week, and being aware that obtaining a leasehold mortgage is no simple matter, as of February 8, Irwin had not commenced anything toward documenting Windram's loan.

54.     It is therefore evident that despite all the assurances to the contrary, Irwin was not going to undertake any action until such time as it had a signed commitment.

55.     The February 8 commitment issued by Irwin was objectionable for, among other reasons, not binding Irwin to a closing date as set forth in the proposal. The proposal, reproduced here at Exhibit C, stated at page 4 under the heading "closing date", that "closing date of the Loan shall occur no later than March 15, 2007 ("outside date")." Remarkably, the February 8 commitment letter, at page 2 and elsewhere, stated the closing would occur "no later than April 30". Windram changed this date back to March and, along with other changes, immediately sent it back to Irwin.

56.     On February 9, 2007 Irwin issued a revised commitment letter. A true and accurate copy of the February 9, 2007 commitment letter is annexed hereto as Exhibit "G". Among other changes Irwin, at page 2 and elsewhere, added it would use "best efforts to close by March 31, 2007", yet kept the April 30 date as well.

57.     Even though the proposal fee was paid in December 2006, and even though Irwin, as evidenced by its letter of January 22, 2007, knew it had the wherewithal to speed the process by using the proposal fee to conduct its searches and other underwriting requirements prior to issuance of a commitment, and even though Windram, as of January 22, 2007, consented to the use of its proposal fee for the underwriting, and even though the leasehold information was received by January 30, as of February 9, 2007 Irwin had not done anything on the loan.

10

58.     In fact, and as is confirmed in an e-mail of February 13, 2007, authored by Carla Ray of the law firm of Ivy Barnum and O'Mara, the outside attorneys retained by Irwin to document the loan, it was not until February 13, 2007 that the title reports were ordered.  A true and accurate copy of the February 13, 2007 e mail is annexed hereto as Exhibit "H".

59.     Though Irwin had the proposal fee as of December 2006, more than seven weeks had gone by and Irwin had not done anything on the loan,  despite its repeated promises of a March closing and despite its repeated representations regarding its specialized knowledge of franchise restaurant financing.

60.     In fact, even though information regarding the landlords was given to Irwin on January 30, and even though Windram consented to start the documentation process prior to a commitment, it was not until February 16, 2007 that a draft form of landlord documentation was forwarded to Windram. Also on that date, via e-mail, Irwin, through Carla Ray of the law firm of Ivy Barnum and O'Mara, issued a loan closing checklist that stated, at the bottom on the last page of the attachment, for a March 30th funding date closing needed to occur no later than March 19th.  A true and accurate copy of the e-mail from Carla Ray is annexed hereto as Exhibit "I".

61.     Thus as of February 16, 2007, with title having just been ordered and none of the landlords having been contacted, Irwin advised that to meet a March 31 date it was necessary that all signed documents be delivered no later than March 19 – just 30 days away.

62.     Despite having represented its specialized knowledge and unique expertise, and despite having represented in writing in December that the "closing date of the Loan shall occur no later than March 15, 2007 ("outside date")", Irwin on March 5 had not even contacted one, let alone all eight, of the landlords for purposes of effecting the necessary leasehold mortgages.

63.     Windram was now in a precarious position.  It faced significant financial consequences if it did not close by March 31. Due to the inexplicable and palpable misrepresentations repeatedly made by Irwin, Windram lacked any confidence in any of their statements let alone business abilities.

64.     In order to mitigate looming damages, Windram was forced to seek alternatives for its financing, alternatives other than Irwin.

65.     On March 5, as memorialized in a letter of March 7, Windram declared Irwin in breach, terminated the deal and proceed to conclude its financing elsewhere.  This lawsuit followed.

11

## COUNT ONE
### FRAUD

1.    Defendant/Counterclaimant, Windram Enterprises, Inc., repeats and realleges each and every allegation set forth in the section denominated Facts Common to All Counts of the Counterclaim as if set forth herein at length.

2.    At all times relevant Irwin held itself out as being a financial services enterprise that provided financing to franchisees.

3.    At all times relevant hereto Irwin solicited Windram for possible loan transactions.

4.    Irwin advised Windram that it possessed the knowledge, skill and sophistication to address Windram's franchise financing requirements.

5.    In or about the winter of 2006, Windram and its affiliates were in need of franchise financing.  In reliance upon the representations made by Irwin that it had the knowledge, skill and expertise necessary to fulfill Windram's financing needs, Windram proceeded to address its franchise financing needs through Irwin.

6.    Irwin was apprised by Windram that the transaction was time sensitive and repeatedly Irwin replied that it would be able to meet the time sensitive deadline advised by Windram.  These representations were made orally and also memorialized in, among other places, written documents between the parties including, but not limited to, the proposal letter annexed hereto as Exhibit C.

7.    At all times relevant when Irwin advised it would be able to close the transaction as contemplated by Windram, Irwin knew that it had then no intention of closing in the time period prescribed by Windram.  These misrepresentations, made orally, were also memorialize in, but not limited to, Irwin's proposal letter as well as its commitment letter of February 9, 2007.

8.    Indeed, to further its misrepresentation Irwin went so far as to issue its letter of January 22, indicating it would proceed in advance of an actual commitment, yet did nothing until the middle of February.

9.    Not only did Irwin stand to gain substantially from its misbehavior, but hooking Windram as a client had other benefits.  Irwin's home page on its website (Exhibit A) states under latest news that since late 2001 it originated more than $1 Billion in new loans.  In the aggregate the financing to

Windram, which exceeded $10 Million, represented 1% of that total.  From an average perspective, the $1 Billion that Irwin says it has originated since 2001 equates to $165 Million annually which means that Windram's business represented 6% of annualized gross bookings.

10.     The facts as alleged demonstrate that Irwin would intentionally do anything and say anything all to obtain Windram's business including making misrepresentations regarding a closing date.

11.     The misrepresentations made by Irwin were false, and known to be false by Irwin.

12.     The misrepresentations as aforesaid were material and reasonably relied upon by Windram.

13.     Upon information and belief it is a pattern and practice of Irwin to make misrepresentations to its customers all in an effort to induce them to sign financing agreements, so that Irwin may and does earn fees even though Irwin does not properly perform.

14.     Evidence of this pattern and practice is peculiarly in Irwin's control, but some of it is evident in the materials possessed by Windram.

16.     The letter of January 22 (Exhibit D) demonstrates Irwin's ability to commence loan underwriting in advance of issuance of a commitment letter.  The fact though that it did nothing until mid February demonstrates how, as a pattern and practice, Irwin uses a say anything mentally to rope in potential customers.

17.     All in all Irwin misrepresented that a closing by March 31 would be accomplished which misrepresentation was compounded when Irwin went through the charade beginning with the January 22nd letter that work would begin in advance of a commitment letter.

18.     The misrepresentations as aforesaid were fraudulent, made in a calculated, intentionally and designed plan to deceive Windram into believing a closing by March 31 would in fact take place.

19.     As part of this practice, Irwin committed to close the loan in accordance with the time limitations outlined by Windram, and did so with no then present intention of timely complying.

20.     As part of this transaction Windram paid Irwin the sum of $40,000.00.

21.     Because of its fraud no portion of the $40,000.00 has been earned by Irwin.

22.     In or about March 2007 it became plainly obvious that Irwin would never meet the time deadline as it completely failed to undertake in a timely and diligent manner those steps necessary to

13

meet with the closing date as agreed to by Irwin with Windram.

23.     As a direct and proximate result of the conduct as aforesaid, Windram has been damaged.

**WHEREFORE**, Defendant/Counterclaimant, Windram Enterprises, Inc., demands judgment against Plaintiff, Irwin Franchise Capital Corporation, for damages, punitive damages, together with interest, cost of suit, reasonable attorney's fees and such other and further relief as the Court deems just and equitable in the premises.

**COUNT TWO**
**FRAUD IN THE INDUCEMENT**

1.     Defendant/Counterclaimant, Windram Enterprises, Inc., repeats and realleges each and every allegation set forth in the section denominated Facts Common to All Counts and of Count One of the Counterclaim as if set forth herein at length.

2.     The conduct as aforesaid constitutes fraud in the inducement.

3.     As a direct and proximate result, if it is determined a contract subsists between Windram and Irwin same is voidable.

**WHEREFORE**, Defendant/Counterclaimant, Windram Enterprises, Inc. respectfully requests that judgment be entered against Plaintiff, Irwin Franchise Capital Corporation, declaring that the alleged contract is voidable, deeming it voided, ordering the return of the $40,000.00 payment made, damages, together with interest, cost of suit, reasonable attorney's fees and such other and further relief as the Court deems just and equitable in the premises.

**COUNT THREE**
**NEGLIGENT MISREPRESENTATION**

1.     Defendant/Counterclaimant, Windram Enterprises, Inc., repeats and realleges each and every allegation set forth in the section denominated Facts Common to All Counts and of Counts One and Two of the Counterclaim as if set forth herein at length.

2.     Irwin repeatedly and purposefully represented that it possessed specialized expertise in the field of restaurant franchise financing. So too, it proffered that it was an expert in the professional field of restaurant franchise financing.

3.     Irwin sought out Windram and used its propaganda regarding its supposed special knowledge and unique expertise to induce Windram into proceeding with the ill fated financing package.

14

4.    Because Irwin knew that Windram was relying on this supposed expertise, and since it levereged this perception in seeking out Windram, Irwin owed a duty to Windram to give correct information.

5.    Based on its own proclaimed expertise Irwin represented that it could readily close Windram's loan by March 2007.  This representation was false and was either known to be false or should have been known by Irwin

6.    The representations made by Irwin to Windram were for an important purpose for Windram and Irwin knew of that purpose and that Windram was relying thereon.

7.    Windram, which is not in the business of booking multimillion dollar financing, relied upon the expertise and specialized and unique experience of Irwin when it believed Irwin's representation that a closing by March 31, 2007 would occur.

8.    The representation as to a closing date, reinforced by the misrepresentation that work would begin in advance of a commitment letter as made in the January 22 letter was false and constitutes negligent misrepresentation.

**WHEREFORE**, Defendant/Counterclaimant, Windram Enterprises, Inc. respectfully requests that judgment be entered against Plaintiff, Irwin Franchise Capital Corporation, declaring that the alleged contract is voidable, deeming it voided,  ordering the return of the $40,000.00 payment made, damages, together with interest, cost of suit,  reasonable attorney's fees and such other and further relief as the Court deems just and equitable in the premises.

**COUNT FOUR**
**BREACH OF CONTRACT**

1.    Defendant/Counterclaimant, Windram Enterprises, Inc., repeats and realleges each and every allegation set forth in the section denominated Facts Common to All Counts and of Counts One, Two and Three of the Counterclaim as if set forth herein at length.

2.    Without admitting a subsisting contract exists between Windram and Irwin, if there is a contract it was breached by Irwin

3.    As a direct and proximate result of the breach committed by Irwin, Windram has been damaged.

15

4.      The damages to Windram include the $40,000.00 paid to date, as well as out of pocket expenses incurred by Windram for legal fees in the failed transaction, costs in the failed transaction as well as legal fees incurred in the within lawsuit.

WHEREFORE, Defendant/Counterclaimant, Windram Enterprises, Inc., demands judgment against Plaintiff, Irwin Franchise Capital Corporation, for damages together with interest, cost of suit, reasonable attorney's fees and such other and further relief as the Court deems just and equitable in the premises.

**COUNT FIVE**
**BREACH OF COVENANTS OF GOOD FAITH AND FAIR DEALING**

1.      Defendant/Counterclaimant, Windram Enterprises, Inc., repeats and realleges each and every allegation set forth in the section denominated Facts Common to All Counts and of Counts One, Two, Three and Four of the Counterclaim as if set forth herein at length.

2.      Without admitting a subsisting contract exists between Windram and Irwin, if there is a contract Irwin, as result of the conduct as aforesaid, breached the implied covenants of good faith and fair dealing.

3.      As a direct and proximate result of the breach committed by Irwin, Windram has been damaged.

4.      The damages to Windram include the $40,000.00 paid to date, as well as out of pocket expenses incurred by Windram for legal fees in the failed transaction, costs in the failed transaction as well as legal fees incurred in the within lawsuit.

WHEREFORE, Defendant/Counterclaimant, Windram Enterprises, Inc., demands judgment against Plaintiff, Irwin Franchise Capital Corporation, for damages together with interest, cost of suit, reasonable attorney's fees and such other and further relief as the Court deems just and equitable in the premises.

**COUNT SIX**
**DECLARATORY JUDGMENT**

1.      Defendant/Counterclaimant, Windram Enterprises, Inc., repeats and realleges each and every allegation set forth in the section denominated Facts Common to All Counts and of Counts One, Two, Three, Four and Five of the Counterclaim as if set forth herein at length.

16

2.      Without admitting a subsisting contract exists between Windram and Irwin, if there is a contract it was drafted by Irwin.

3.      The allegations asserted by Irwin in its Complaint show that it claims it is entitled to both a fee and reimbursement for out of pocket expenses.

4.      This interpretation by Irwin is wrong.  The document does not so provide.  Moreover, if it can be so reasonably interpreted there is an ambiguity.  Alternatively the document may reasonably be interpreted to mean that only reimbursement for out of pocket expenses may be collected by Irwin. Since Irwin is the draftsman the document must be construed against Irwin and in either event will not permit Irwin to recover both a fee and reimbursement for out of pocket expenses.

5.      In fact, all Irwin may be entitled to, if there is a contract, is reimbursement for all its out of pocket expenses which according to the Complaint total $57,620.89 from which amount is deducted the $40,000.00 already paid thereby yielding only an amount in controversy of $17,620.89.

**WHEREFORE**, Defendant/Counterclaimant, Windram Enterprises, Inc. hereby demands that a declaratory judgment be issued, declaring and decreeing that if a contract exists between it and Plaintiff, Irwin Franchise Capital Corporation, that the contract only obligates, if at all, Defendant/Counterclaimant Windram Enterprises, Inc., to reimburse Plaintiff, Irwin Franchise Capital Corporation, only such sums for out of pocket expenses actually incurred and paid together with a set off for the $40,000.00 paid by Defendant/Counterclaimant, Windram Enterprises, Inc.

**COUNT SEVEN**
**REFORMATION**

1.      Defendant/Counterclaimant, Windram Enterprises, Inc., repeats and realleges each and every allegation set forth in the section denominated Facts Common to All Counts and of Counts One, Two, Three, Four, Five and Six of the Counterclaim as if set forth herein at length.

2.      Without admitting a subsisting contract exists between Windram and Irwin, if there is it fails to properly state that all Irwin is entitled to, if anything, is reimbursement for all out of pocket expenses.

3.      Without admitting a subsisting contract exists between Windram and Irwin, if there is it should be reformed to provide that all Irwin is entitled to, if anything, is reimbursement for all out of

17

pocket expenses.

**WHEREFORE**, Defendant/Counterclaimant, Windram Enterprises, Inc. hereby demands that a declaratory judgment be issued, declaring and decreeing that if a contract exists between it and Plaintiff, Irwin Franchise Capital Corporation, that the contract only obligates, if at all, Defendant/Counterclaimant Windram Enterprises, Inc., to reimburse Plaintiff, Irwin Franchise Capital Corporation, only such sums for out of pocket expenses actually incurred and paid together with a set off for the $40,000.00 paid by Defendant/Counterclaimant, Windram Enterprises, Inc.

**COUNT EIGHT**
**DURESS**

1.      Defendant/Counterclaimant, Windram Enterprises, Inc., repeats and realleges each and every allegation set forth in the section denominated Facts Common to All Counts and of Counts One, Two, Three, Four, Five, Six and Seven of the Counterclaim as if set forth herein at length.

2.      Without admitting a subsisting contract exists between Windram and Irwin, if there is it voidable due to duress.

3.      Windram, believing that Irwin started work as of January 30, was in a financially precarious position when it signed the commitment of February 9.  As of that late Windram had no options.  When Irwin then changed the deal by changing the date, Windram was under duress.

4.      Without admitting a subsisting contract exists between Windram and Irwin, if there is it should be voided due to duress and the $40,000 should be returned to Windram..

**WHEREFORE**, Defendant/Counterclaimant, Windram Enterprises, Inc. hereby demands that a declaratory judgment be issued, declaring and decreeing that if a contract exists between it and Plaintiff, Irwin Franchise Capital Corporation, that the contract void and the $40,000.00 paid by Defendant/Counterclaimant, Windram Enterprises, Inc. be returned

Dated: October 19, 2007                        By:
        Hoboken, New Jersey                         Richard W. Mackiewicz, Jr., Esq. (RM 0863)
                                                    MACKIEWICZ & ASSOCIATES, L.L.C.
                                                    625 Washington Street
                                                    Hoboken, New Jersey 07030
                                                    (201) 217-1500
                                                    Attorneys for Defendant Windram Enterprises, Inc.

X:\DOCS\DOCS\IRWM\Active Matters\Windram Enterprises v. Irwin Franchise LI.1125.RWM\Pleading\Answer & Amended Counterclaim.wpd

18

# EXHIBIT A





| HOME | ABOUT US | SERVICES | CUSTOMERS | CALENDAR | NEWS |



## WELCOME TO IRWIN FRANCHISE CAPITAL
### Delivering creative, tailored financing solutions with exceptional service.

  

**At Irwin Franchise Capital Corporation (IFCC)**, we have more than just competitive rates. We have a keen understanding of franchised restaurant business that comes from decades spent providing franchised restaurant financing. In 2006, we added professional practice financing to our product mix.

Instead of taking a "one solution fits all" approach to lending, we use our experience to customize loans that take your specific needs into account. And, throughout the process, you'll experience our commitment to customer service. IFCC's team of financial professionals are available to offer advice, answers and assistance all along the way.

Call to see how we can help with your restaurant financing or professional practice financing. **(888-551-3622)**

## IRWIN FRANCHISE CAPITAL SERVICES

| | |
|---|---|
| Equipment | Acquisitions |
| Real Estate | Remodel |
| Refinance | Small Business Administration |
| New Store Development | Professional Practice Acquisition |

## LATEST NEWS

**09.28.07**
Irwin Franchise Capital Corporation (IFCC) recently closed two transactions totaling $6.93 million for JRC Pizza/Elite Team of Midland, Texas.
The recapitalization and acquisition financing project allowed the Domino's franchisee to acquire 23 stores in Arizona and refinance his existing units in Texas.

**09.28.07**
Irwin Franchise Capital Corporation (IFCC) recently reached several significant milestones.
Since joining Irwin Financial Corporation in late 2001, IFCC has originated and funded more than $1 billion in new loans. In addition, IFCC's on balance sheet and serviced portfolio exceeds $700 million in originated loans.

**08.08.07**
V & E Management
Irwin Franchise Capital Corporation recently won a $9.97 million financing deal with V & E Management, Inc., and St. Juste Management Corporation, both companies of a leading Burger King franchisee in Texas.

**08.01.07**
Irwin Commercial Finance Reports 13% Increase in QII/07 Net Income
Irwin Financial Corporation

reported that its consolidated loan and lease portfolio grew to $5.5 billion as of June 30, up 7% on an annualized basis from the end of the first quarter, mainly attributable to growth in the company's commercial finance portfolio.

**03.19.07**
Parks Joins Staff
Irwin Franchise Capital Corporation, a subsidiary of Irwin Commercial Finance Corporation and part of Irwin Financial Corporation, a public traded bank holding corporation, recently made a new appointment to its staff.

UPCOMING EVENTS

**10/22/2007 - 10/23/2007**
2007 Leadership Conference

**10/25/2007 - 10/27/2007**
IHFA 2007 Convention

**10/26/2007 - 10/28/2007**
Popeye's International Franchise Conference

More Events and Details »

© 2006 Irwin Commercial Finance. All rights reserved.

# EXHIBIT B





| HOME | ABOUT US | ▶ SERVICES | CUSTOMERS | CALENDAR | NEWS |
|---|---|---|---|---|---|

**SERVICES**

▶ Overview

   Financeable Costs

Equipment

Real Estate

Refinance

New Store Development

Acquisitions

Remodel

Small Business Administration

Professional Practice

## Services

Irwin Franchise Capital Corporation (IFCC) is focused on the franchised restaurant industry. In 2006, we added professional practice acquisition financing to our product mix. We provide loans and mortgage financing at competitive rates, tailored to meet your needs.



**What do we do?**
Just like our parent company, we have grown and changed to better serve our customers. When IFCC began, we only did equipment financing and generally, the loans were less than $300,000. That has all changed.

IFCC now offers both conventional and SBA-backed loans for equipment and real estate. We have expanded our lending ability to include loans from six figures to in excess of eight figures. Our minimum transaction size is $100,000, although we have the ability to help secure smaller loans through our sister company, Irwin Commercial Finance.

Our customers rely on us to acquire equipment and real estate, remodel or re-image their stores, finance new construction, acquire an existing store, refinance debt or restructure ownership. Typical equipment packages are financed up to $500,000 or more, based on the particular type of restaurant. Real estate is financed for a percentage of its market value as determined by independent appraisal.

We recognize that one loan structure does not fit every borrower's need and because of that we are flexible. Our terms generally range up to 7 years for equipment and leasehold improvement loans and 15 years for real estate. We provide construction financing for new builds, and progress payment advances for equipment deposits and interim contractor invoices during remodels and leasehold improvements. IFCC offers both fixed and variable rates, and, unlike other providers, you can lock in your adjustable rate at any time during the term of your loan. This customization allows you to secure financing which fits your needs, not the other way around.

Our loan commitments generally come with a six-month window within which to close.

**Quick links**

What do we do?
For what uses does IFCC lend money?

How much do you lend?
What are IFCC's terms/rates
What is needed for collateral?
Are there any other requirements?
Who is eligible?
What does it take to close a loan?
What costs are financeable?
Why Irwin Franchise Capital Corp.?
When should I get started?
How do I start?

This gives you the assurance of committed financing before you undertake your project and the time to plan and contract for the work without fear of losing your financing. But, if your project is immediate, Irwin can work with you to close many loans within two to four weeks. Real estate loans typically require up to eight weeks to close due to the more extensive documentation process. We invite you to compare our closing costs to other companies. Since we close all equipment and leasehold improvement loans in-house, you will find it quite cost effective.

The Small Business Administration of the federal government sets the guidelines for the terms and conditions of its guaranteed loans. Irwin Union Bank and Trust is a preferred lender under the SBA program and IFCC is approved for the SBA Express Program where loans under $350,000 are processed and closed completely in-house.

back to top

### For what uses does IFCC lend money?

- Real Estate Mortgages
- Acquire Equipment
- Remodel or Re-image
- Finance Construction
- Acquire Stores
- Refinance Debt
- Restructure Ownership

back to top

### How much do you lend?

- Transactions range from six figures to in excess of eight figures
- Equipment package typically up to $500,000 based on concept average cost
- Real estate loans based on concept average cost and appraised value

back to top

### What are IFCC's terms/rates?

- Typically to 7 years on equipment and leaseholds
- Typically to 15 years on real estate
- Fixed interest rate set at closing
- Adjustable rate (1, 3 or 5 year resets)

back to top

### What is needed for collateral?

- First lien on equipment, furniture and leasehold improvements
- First mortgage on real estate
- Leasehold mortgages on ground leases

back to top

### Are there any other requirements?

- Personal guarantees of owners
- Assumable with consent of IFCC and Franchisor

back to top

### Who is eligible?

- Established franchise operator
- Established franchise system

back to top

### What does it take to close a loan?

- Typically 2 to 4 weeks after executed commitment for equipment and leaseholds
- Real estate subject to usual documentation timing
- Low closing costs - documentation prepared in-house for equipment and leaseholds
- Progress payment plan for flexible funding of equipment deposits and construction costs

back to top

### Why Irwin Franchise Capital Corporation?

Ask our customers. We did. They told us our service is what sets us apart from the competition. We are known for returning phone calls, getting answers to questions and making sure your needs are met. And, our rates are certainly competitive.



Since IFCC is focused singularly on the franchised restaurant industry, our staff doesn't need time to learn about your business. It is their area of expertise. But, that doesn't mean that we don't want to learn more about you. Our staff spends considerable time on the road going to our customers' restaurants, getting an even more keen understanding of their operation.

Add to this, the strong financial backing of our parent company and the individual customization described earlier, and you can see why our customer list has grown exponentially year after year.

back to top

### When should I get started?

The larger the project, the more lead time you should have. Many customers contact us six months prior to the need for financing. That allows us to



ensure we have all of the necessary information and can get started on the process. Once we hear from you, we will request you fill out a short credit application and send us a copy of your most recent year's P&Ls. From that information, we can issue a proposal in as little as 24 hours.

If you accept our proposal, we will send you the list of documents needed to fully complete your credit application. Once we get those, our credit department will review the application and approve your loan within 30 days.

back to top

**How do I start?**
Probably the easiest way to start is to call us at **888-551-3622**. The Account Manager for your state will listen to your needs and send you our 3-page credit application or download it here.

If you attend your franchisor's convention, it is likely you'll run into one of our Marketing Vice Presidents or other staff members. We would love to visit with you about your growth plans and answer any questions you may have.

**Put our service to the test by calling today, 888-551-3622.**

Home | About Us | Services | Customers | Calendar | News

Contact Us | Client Login | ICF Main | Site Map | Terms of Use | Privacy Policy | Phishing Statement

© 2006 Irwin Commercial Finance. All rights reserved.

**EXHIBIT C**

December 20, 2006



Mr. Arthur Windram
President
Windram Enterprises, Inc
dba / KFC
PO Box 374
Pawling, MA  12564

RE:  KFC/ Fixed Rate Loan
"Refinance/Remodel"

Dear Artie:

Subject to terms and conditions hereof, we are pleased to propose to you the following loan arrangements:

| | |
|---|---|
| **Borrower:** | Windram Enterprises, Inc, (et el) |
| **Franchisor:** | Yum Brands / KFC |

**Maximum Loan Amount:**      **$ 10,600,000**    (as follows:

| | |
|---|---|
| Peekskill | $ 1,000,000 |
| Hopewell | 200,000 |
| Fishkill | 1,400,000 |
| Yorktown | 200,000 |
| Carmel | 750,000 |
| Pawling | 700,000 |
| Bridgeport/Boston | 1,000,000 |
| Bridgeport/N.Main | 750,000 |
| Stratford Barnum | 750,000 |
| Waterbry/ Lake | 750,000 |
| Waterbry/W.Main | 750,000 |
| Orange | 1,250,000 |
| Naugatuck | 750,000 |
| Bridgeport/ Xpress | 350,000 |

**Purpose of Loan:**      To refinance the debt of the above fourteen(14) KFC units(3 fee sites) throughout the lower Hudson Valley region of NY State and CT. ("The Premises")

**\* NY \***
-    **Real Property / Ground Leases –**

**(Carmel & Peekskill)**
**Loan Amount of $ 1,500,000**

| | |
|---|---|
| **Term/** **Amortization:** | 120 months (10 Yrs) 180 months (15 Yrs) |
| **Monthly** **Payments**: | $ 14,119.04 (based on $1,500,000)of equal monthly installments, applied first to charges, if any, than to the balance of the obligations.  Interest rate is 7.75% |

**-Equipment –**

**(4 Equipment Packages /Peekskill-$250M,**
**Hopewell-$200M, Yorktown-$200M, &**
**Pawling-$750M, NY)**
**Loan Amount of  $ 1,350,000**

| | |
|---|---|
| **Term/** **Amortization:** | 84 months  (7 Yrs)  / Fully amortizing 84 months (7 Yrs) |
| **Monthly Payment:** | $ 20,837.55. (based on $ 1,350,000). Equal monthly payments, applied first to charges, if any, then to the balance of the obligations.  The interest rate over the payment stream is 7.90%. |

**\* CT \***
**-Real Property / Ground Leases-**
(Bridgeport-N.Main, Stratford, Waterbury-Lake,
Waterbury-W.Main, Naugatuck)
Loan Amount of $2,500,000 ($500,000 per)

| | |
|---|---|
| **Term/** **Amortization:** | 120 months (10 Yrs) 180 months (15 Yrs) |
| **Monthly** **Payments**: | $ 23,380.89 (based on $2,500,000)of equal monthly installments, applied first to charges, if any, than to the balance of the obligations.  Interest rate is 7.75% |

**\* CT \***
**-Real Property / Fee Simple-**
( Bridgeport –Boston, Orange)
Loan Amount of $2,250,000

| | |
|---|---|
| **Term/** | 120 months (10 Yrs) |

| | |
|---|---|
| **Amortization:** | 240 months (20 Yrs) |
| **Monthly Payments:** | $ 18,352.81 (based on $2,250,000)of equal monthly installments, applied first to charges, if any, than to the balance of the obligations.  Interest rate is 7.75% |

**-Equipment –**

**(6 Equipment Packages /Bridge-North- $250M, Stratford-$250M, Waterbury-Lake-$250M, Waterbury-W. Main-$250M, Naugatuck-$250M and Bridgeport-Express-$350M Loan Amount of $ 1,600,000**

| | |
|---|---|
| **Term/ Amortization:** | 84 months  (7 Yrs)  / Fully amortizing<br>84 months (7 Yrs) |
| **Monthly Payment:** | $ 24,695.72. (based on $ 1,600,000). Equal monthly payments, applied first to charges, if any, then to the balance of the obligations.  The interest rate over the payment stream is 7.90%. |
| **Collateral:** | A first blanket lien on all personal property, fixtures & equipment on all units and a first position leasehold mortgage / assignment of lease against the Carmel, Peekskill, Bridgeport-N, Stratford, Waterbury-Lake, Waterbury-Main, Naugatuck units.  Also, a fee simple mortgage/deed of trust against Bridgeport-Boston and Orange/ "Premises". |
| **Guaranties:** | Any and all affiliated KFC entities.  Mr. Arthur Windram. |
| **Rate Index:** | The Monthly Payments and the terms set forth in this proposal letter are based upon the facts and assumptions set forth herein and on conditions in the capital markets as they affect our sources of funds. The terms and conditions shall be subject to adjustment in the event any of the facts or assumptions are incorrect or change prior to the Closing. Furthermore, if immediately prior to the funding of the Loan, the internal prime transfer rate at Irwin Union Bank and Trust Corporation ("Irwin Bank") (the "Indexs") exceed 5.0%, than the Monthly Payments shall be increased by such |

increase (but in no event more than the maximum permitted by law). The Monthly Payment Factor and the Monthly Payments will not take into account any origination fees; security deposits, advance payments or similar charges provided for herein or in the Loan documents.

**Prepayment:** All loans can be paid off in their entirety, after the completion of ½ of their respective terms, at the greater of 2% of the outstanding balance or yield maintenance.   All loans are fully assumable.

**Net Loan:** All payments are to be net of all charges, expenses, etc. All insurance, maintenance and taxes, with respect to the transaction, the Premises, the Monthly Payment and the Equipment are Borrower's complete responsibility.

**Documentation:** All documentation shall be prepared or reviewed by us or our counsel and shall consist of, among other things, a note, security agreement and such other documents as we and our counsel deem appropriate, which shall set forth the terms of the transaction contemplated by this proposal letter (collectively the "Loan Documents"). The Loan Documents shall include, among other things, provisions normal and customary to transactions of this nature, including covenants, financial reporting requirements, representations and warranties.

**Origination Fee:** Borrower shall pay an origination fee of 1/2% of the Maximum Loan Amount.

**Closing Date:** The closing date of the Loan shall occur no later than March 15th, 2006  ("Outside Date").

**Reporting Covenants:** The Borrower shall deliver to us within 120 days of the closing of Borrower's fiscal year audited financial statements for the year just ended, including a breakdown showing the results for the Premises. In the event audited statements are not prepared, financial statements certified by a principal of Borrower may be substituted.

This proposal is subject to, among other things, and a commitment will only be issued

upon:

    (i)      our receipt of all financial and credit information requested by us; and

    (ii)     our receipt of such appraisals, waivers, releases, policies of insurance, documents and such further instruments as we deem necessary in form and substance acceptable to us and our counsel: and

    (iii)    the written approval of our Senior Review Committee, as to pricing, term, structure, credit and other conditions.

    (iv)

If this proposal is satisfactory to Borrower, please have Borrower sign the attached copy of this letter and return it to us with a proposal fee in the sum of $ 30,000 which will evidence Borrower's acceptance of this proposal and serve as authorization for us to submit this proposal to Senior Review Committee. If we do not approve Borrower's application, then upon written request of Borrower, the proposal fee will be refunded to Borrower without interest. If Borrower's application is approved by us, such funds will be credited against the "Charges and Expenses" and the balance, if any, to the first payments due us. If, after approval of this transaction Borrower fails to complete this transaction for any reason, the proposal fee shall be deemed earned and non-refundable.

This proposal is provided solely for the Borrower's benefit and shall not be reproduced, distributed, quoted, or otherwise made reference to. This letter does not constitute a commitment by us.

Please return to us a copy of this letter, executed by Borrower, acknowledging Borrower's acceptance of the terms hereof. In the event that a Borrower-executed copy of this proposal and the proposal fee are not received by us within ten (10) days of the date hereof, this proposal shall be deemed withdrawn.

Very truly yours,

**Irwin Franchise Capital Corporation**
**Charles H. Fletcher**
**Marketing Vice President**

**AGREED AND ACCEPTED:**

**Windram Enterprises, Inc et el**

**By:**_____

**Title:**_____**Date:**_____

**EXHIBIT D**



**Irwin**
**Franchise Capital**

10 Paragon Drive
Montvale, NJ 07645-1718
(201) 326-4000

January 22, 2007

Mr. Arthur Windram
President
Windram Enterprises, Inc.
P.O. Box 374
Pawling, MA 12564

Re: Letter dated December 20, 2006 between Irwin Franchise Capital Corporation ("IFCC") and Windram
Enterprises, Inc. ("Borrower(s)") ("Proposal Letter")

Dear Mr. Windram:

By your signature below Borrower will agree to pay all IFCC's costs and expenses incurred in connection
with the documentation, processing, negotiation and closing of all transactions as proposed in the
referenced Proposal Letter. Processing an acquisition loan is time consuming. To shorten the processing
time, IFCC can begin processing procedures upon receipt of the proposal fee as outlined in the said Proposal
Letter, prior to approval.

If Borrower(s)' loan application is approved by IFFC, the proposal fee(s) will be credited against the
required commitment fee and applied against the charges and fees at closing, and the balance, if any, to the
first payments due IFCC. If, after approval of this transaction Borrower(s) fails to complete this transaction
for any reason, the proposal fee shall be deemed earned and non-refundable. If a loan commitment is not
issued by IFCC, then upon Borrower(s)' written request, the proposal fee will be refunded to Borrower(s)
less any processing expenses incurred by Lender.

Very truly yours,

**Irwin Franchise Capital Corporation**

Bernice H. Carr
Senior Vice President Documentation & Closing

**AGREED & ACCEPTED**

**Windram Enterprises, Inc.**

By: _____
Name: _____
Title: _____
Date: _____

**EXHIBIT E**

# John Klarl

**From:**     Charles Fletcher [charles.fletcher@irwincf.com]

**Sent:**     Friday, February 02, 2007 10:52 AM

**To:**     John Klarl

**Subject:** FW: Irwin Franchise Capital / Windram Enterprises

John.....
I understood that the remaining 1-2 ground leases were being sent to me from your office?     I haven't received
anything yet.     Did I misunderstand, or are they still coming?
Thanks, Chuck

---

**From:** Charles Fletcher
**Sent:** Tuesday, January 30, 2007 10:36 AM
**To:** 'John Klarl'
**Subject:** RE: Irwin Franchise Capital / Windram Enterprises

Thanks John.     Just got them.

---

**From:** John Klarl [mailto:jjklarl@aol.com]
**Sent:** Tuesday, January 30, 2007 10:24 AM
**To:** Charles Fletcher
**Subject:** RE: Irwin Franchise Capital / Windram Enterprises

Chuck,

Here is my contact information.

Artie overnighted the various Leases to you yesterday.

I look forward to working with you.

Regards,
John


JOHN J. KLARL, ESQ.
WOOD & KLARL, ESQS.
3153 Albany Post Road
Buchanan, NY  10511
(914) 736-0144 (Tel)
(914) 736-9082 (Fax)

---

**From:** Charles Fletcher [mailto:charles.fletcher@irwincf.com]
**Sent:** Tuesday, January 30, 2007 9:17 AM
**To:** jjklarl@aol.com
**Subject:** Irwin Franchise Capital / Windram Enterprises

John....
Following up our conversation on Friday, can you please give me an idea when I can receive the leases or abstracts for the ground lease locations we highlighted on our call?
In addition to understanding how friendly the leases are to a lender, we obviously want to make sure the loan terms proposed do not exceed the lease terms.

Thanks, Chuck

Charles Fletcher
Marketing Vice President
Irwin Franchise Capital
10 Paragon Drive
Montvale, NJ 07645
(O) 201 326-4009

2/2/2007

**EXHIBIT F**

Irwin Franchise Capital Corporation
259 Old Mill Road
Valley Cottage, NY 10389
845.267.5375
845.267.5376 Fax
www.irwinFC.com

February 8, 2007



Arthur Windram
Windram Enterprises, Inc.
P.O. Box 374
Pawling, NY 12564

Dear Mr. Windram:

Irwin Franchise Capital Corporation ("Irwin") is pleased to commit to you subject to all the terms and conditions herein ("Commitment Letter"), and the satisfactory receipt of all documents requested in form and substance, to enter into the following financing arrangements ("Loans") in an aggregate amount of $9,200,00.00 with respect to the franchised KFC restaurants detailed herein. The proceeds of such Loans will provide [1] funds necessary to payoff in full obligations payable by Windram Enterprises, Inc and its wholly owned operating affiliates to General Electric Franchise Finance, including prepayment fees that relate to the pay-off of such obligations, [2] funds necessary to pay the aggregated cost relating to the closing of the Loans, and [3] funds that will be used for general corporate purposes. The general terms and conditions of the Loans are set forth under the following identified Transaction 1, Transaction 2, and Transaction 3, and in the attached Exhibit B, and Special Terms and Conditions of the Loans are set forth in Exhibit C, each attached hereto and made a part hereof.

**TRANSACTION 1**

| | |
|---|---|
| **Transaction 1 Borrowers:** | The Transaction 1 Borrowers are identified in Exhibit D, attached hereto and made a part hereof. |
| **Maximum Loan Proceeds:** | **$2,950,000.00**, which will be allocated to the individual Transaction 1 Borrowers, and in such amounts ("Transaction 1 Loan(s)"), as outlined in such Exhibit D. |
| **Loan Term:** | **84 months.** |
| **Monthly Payment Factor:** | **0.0156745** for the Transaction 1 Loans, inclusive of interest (adjusted as provided herein). |
| **Monthly Payment** | **$46,239.90** in the aggregate for the Transaction 1 Loans, which will be paid to Irwin in advance in equal monthly installments of principal and interest applied first to interest and the balance to principal. Payments will be made by automatic bank debit ("ACH") from borrowers' designated checking account (see attached form). |
| **Origination Fee:** | A fee of one-half of one percent (0.50%) of the Maximum Loan Amount payable at closing. |

Windram Enterprises, Inc
CCAN 21220
February 8, 2007
Page 2 of 17

**Transaction 1 Index:**    If immediately preceding the closing of the Transaction 1 Loan(s) contemplated herein, the transfer rate charged Irwin by Irwin Union Bank and Trust Company exceeds **5.277%** (the "Index"), the Monthly Payment Factor and Monthly Payments shall be increased based on **290** basis points above the Index, but in no event more than the maximum permitted by law. The Monthly Payment Factor shall not be less than the Monthly Payment Factor stated in this Commitment Letter.

**Closing Date:**    The closing shall be no later than ~~April 30, 2007~~ ("Transaction 1 Outside Date"). *MARCH 25 2007 A.W.*

**Security for
Transaction 1 Loans:**    The following will serve as collateral for the Transaction 1 Loans:

1. First security interest in the furniture, fixtures, equipment, and tenant improvements located at each of the Transaction 1 Premises, as are identified on the attached Exhibit D, and used in the operation of such Transaction 1 Premises ("Transaction 1 Equipment").
2. An assignment of KFC of Pawling, Inc's interest as tenant under the ground lease for the premises of the KFC of Pawling , Inc store.
3. All Loans shall be cross-collateralized and cross-defaulted with all obligations payable to Irwin by the herein identified Transaction 1 Borrowers, Transaction 2 Borrowers, and Transaction 3 Borrowers.

**Corporate Guarantors:**    All of the Transaction 1 Borrowers' obligations to Irwin shall be unconditionally guaranteed by all entities that are affiliated with the Transaction 1 Borrowers' common officers, directors, and/or stakeholders including but not limited to:

| | |
|---|---|
| Windram Enterprises, Inc | A & F Windram Corp |
| ARJ Management Corp | ARW Corporation |
| KFC of Carmel, Inc | F Windram Corp |
| KFC of Pawling, Inc | FRAN Corporation |
| KFC of Peekskill, Inc | Patrick & Helen Corp |
| Windram Management Corp | Naugatuck Quality Foods, Inc |
| KFC of Yorktown, Inc | Bridgeport Express Foods |
| A Windram Corp | |

**Personal Guarantor:**    All of the Transaction 1 **Borrowers'** obligations to Irwin shall be unconditionally guaranteed by **Arthur Windram.**

[Intentionally blank]

Windram Enterprises, Inc
CCAN 21220
February 8, 2007
Page 3 of 17

## TRANSACTION 2

**Transaction 2
Borrowers:**

The Transaction 2 Borrowers are identified in **Exhibit E**, attached hereto and made a part hereof.

**Appraisal Condition:**

Prior to the funding of the Transaction 2 Loans Irwin must be in receipt of an "as built" appraisal for each of the Transaction 2 Premises, as are identified in Exhibit E.

**Maximum
Loan Proceeds**

The aggregate Transaction 2 Maximum Loan Proceeds will be equal to the lesser of:

[1]    **$4,000,000.00**, which will be allocated to the individual Transaction 2 Borrowers, and in such amounts ("Transaction 2 Loan(s)"), as outlined in Exhibit E, or

[2]    **85.00%** of the "as built" appraised value of each of the Transaction 2 Premises.  The Transaction 2 Maximum Loan Proceeds of each Transaction 2 Loan will not exceed 85.00% of the "as built" appraised value of the corresponding Transaction 2 Premises.

**Loan Term:**

**120 months ("Loan Term"), with Monthly Payments based upon a 180-month amortization period.**

**Monthly Payment
Factor:**

**0.0096236** for the Transaction 2 Loans, inclusive of interest (adjusted as provided herein).

**Monthly Payment**

The **$38,494.43** aggregate monthly payment for the Transaction 2 Loans will be paid to Irwin in arrears in equal monthly installments of principal and interest applied first to interest and the balance to principal, with a balloon payment of principal then outstanding at the maturity of the Loan Term. Payments will be made by automatic bank debit ("ACH") from borrowers' designated checking account (see attached form).

**Origination Fee:**

A fee of one-half of one percent (0.50%) of the Maximum Loan Amount payable at closing.

**Transaction 2 Index:**

If immediately preceding the closing of the Transaction 2 Loan(s) contemplated herein, the transfer rate charged Irwin by Irwin Union Bank and Trust Company exceeds **5.366%** (the "Index"), the Monthly Payment Factor and Monthly Payments shall be increased based on **275** basis points above the Index, but in no event more than the maximum permitted by law.  The Monthly Payment Factor shall not be less than the Monthly Payment Factor stated in this Commitment Letter.

**Closing Date:**

The closing shall be no later than ~~April 30, 2007~~ ("Transaction 2 Outside Date"). MARCH 25TH 07 A.W.

Windram Enterprises, Inc
CCAN 21220
February 8, 2007
Page 4 of 17

**Security for**
**Transaction 2 Loans:**    The following will serve as collateral for the Transaction 2 Loans:

1.  First security interest in the furniture, fixtures, equipment, and tenant improvements located at the Transaction 2 Premises and used in the operation of such Transaction 2 Premises ("Transaction 2 Equipment").
2.  An assignment of each Transaction 2 Borrower's interest as tenant under the ground leases for each of the Transaction 2 Premises.
4.  All Loans shall be cross-collateralized and cross-defaulted with all obligations payable to Irwin by the herein identified Transaction 1 Borrowers, Transaction 2 Borrowers, and Transaction 3 Borrowers.

**Corporate Guarantors:**    All of the Transaction 2 Borrowers' obligations to Irwin shall be unconditionally guaranteed by all entities that are affiliated with the Transaction 2 Borrowers' common officers, directors, and/or stakeholders including but not limited to:

| | |
|---|---|
| **Windram Enterprises, Inc** | **A & F Windram Corp** |
| **ARJ Management Corp** | **ARW Corporation** |
| **KFC of Carmel, Inc** | **F Windram Corp** |
| **KFC of Pawling, Inc** | **FRAN Corporation** |
| **KFC of Peekskill, Inc** | **Patrick & Helen Corp** |
| **Windram Management Corp** | **Naugatuck Quality Foods, Inc** |
| **KFC of Yorktown, Inc** | **Bridgeport Express Foods** |
| **A Windram Corp** | |

**Personal Guarantor:**    All of the Transaction 2 Borrowers' obligations to Irwin shall be unconditionally guaranteed by **Arthur Windram.**

[Intentionally blank]

Windram Enterprises, Inc
CCAN 21220
February 8, 2007
Page 5 of 17

## TRANSACTION 3

**Transaction 3
Borrowers:**
The Transaction 3 Borrowers are identified in **Exhibit F**, attached hereto and made a part hereof.

**Appraisal Condition:**
Prior to the funding of the Transaction 3 Loans Irwin must be in receipt of an "as built" appraisal for each of the Transaction 3 Premises, as are identified in Exhibit F.

**Maximum
Loan Proceeds**
The aggregate Transaction 3 Maximum Loan Proceeds will be equal to the lesser of:

[1]     **$2,250,000.00**, which will be allocated to the individual Transaction 3 Borrowers, and in such amounts ("Transaction 3 Loan(s)"), as outlined in Exhibit F, or

[2]     **85.00%** of the "as built" appraised value of the Transaction 3 Premises. The Transaction 3 Maximum Loan Proceeds of each Transaction 3 Loan will not exceed 85.00% of the "as built" appraised value of the corresponding Transaction 3 Premises.

**Loan Term:**
~~180~~ *120* months ("**Loan Term**"), with Monthly Payments based upon a 240-month amortization period.

**Monthly Payment
Factor:**
**0.0084630** for the Transaction 3 Loans, inclusive of interest (adjusted as provided herein).

**Monthly Payment**
*$ 13 858 53*
The ~~$19,044.75~~ aggregate monthly payment for the Transaction 3 Loans will be paid to Irwin in arrears in equal monthly installments of principal and interest applied first to interest and the balance to principal, with a balloon payment of principal then outstanding at the maturity of the Loan Term. Payments will be made by automatic bank debit ("ACH") from borrowers' designated checking account (see attached form).

**Origination Fee:**
A fee of one-half of one percent (0.50%) of the Maximum Loan Amount payable at closing.

**Transaction 3 Index:**
If immediately preceding the closing of the Transaction 3 Loan(s) contemplated herein, the transfer rate charged Irwin by Irwin Union Bank and Trust Company exceeds **5.408%** (the "Index"), the Monthly Payment Factor and Monthly Payments shall be increased based on **275** basis points above the Index, but in no event more than the maximum permitted by law. The Monthly Payment Factor shall not be less than the Monthly Payment Factor stated in this Commitment Letter.

**Closing Date:**
The closing shall be no later than ~~April 30, 2007~~ ("Transaction 3 Outside Date").

*MARCH 25, 07 AW*

Windram Enterprises, Inc
CCAN 21220
February 8, 2007
Page 6 of 17

**Security for**
**Transaction 3 Loans:**     The following will serve as collateral for the Transaction 3 Loans:

1. First mortgage lien as against the real property associated with the Transaction 3 Premises.
2. First security interest in the furniture, fixtures, equipment, and tenant improvements located at the Transaction 3 Premises and used in the operation of such Transaction 3 Premises ("Transaction 3 Equipment").
3. All Loans shall be cross-collateralized and cross-defaulted with all obligations payable to Irwin by the herein identified Transaction 1 Borrowers, Transaction 2 Borrowers, and Transaction 3 Borrowers.

**Corporate Guarantors:**     All of the Transaction 3 Borrowers' obligations to Irwin shall be unconditionally guaranteed by all entities that are affiliated with the Transaction 3 Borrowers' common officers, directors, and/or stakeholders including but not limited to:

| | |
|---|---|
| **Windram Enterprises, Inc** | **A & F Windram Corp** |
| **ARJ Management Corp** | **ARW Corporation** |
| **KFC of Carmel, Inc** | **F Windram Corp** |
| **KFC of Pawling, Inc** | **FRAN Corporation** |
| **KFC of Peekskill, Inc** | **Patrick & Helen Corp** |
| **Windram Management Corp** | **Naugatuck Quality Foods, Inc** |
| **KFC of Yorktown, Inc** | **Bridgeport Express Foods** |
| **A Windram Corp** | |

**Personal Guarantor:**     All of the Transaction 3 Borrowers' obligations to Irwin shall be unconditionally guaranteed by **Arthur Windram**.


**HEREINAFTER, UNLESS OTHERWISE NOTED:**

**THE TRANSACTION 1 BORROWERS, TRANSACTION 2 BORROWERS, AND TRANSACTION 3 BORROWERS SHALL BE REFERRED TO AS "BORROWER",**

**THE TRANSACTION 1 LOANS, TRANSACTION 2 LOANS, AND TRANSACTION 3 LOANS SHALL BE REFERRED TO AS THE "LOANS",**

**THE TRANSACTION 1 PREMISES, TRANSACTION 2 PREMISES, AND TRANSACTION 3 PREMISES SHALL BE REFERRED TO AS THE "PREMISES",**

**THE TRANSACTION 1 EQUIPMENT, TRANSACTION 2 EQUIPMENT, AND TRANSACTION 3 EQUIPMENT SHALL BE REFERRED TO AS THE "EQUIPMENT".**


**THE FOLLOWING TERMS AND CONDITIONS SHALL PERTAIN TO TRANSACTION 1, TRANSACTION 2, AND TRANSACTION 3**

**Assumptions:**     The amount of the Loan(s) and the terms set forth in this Commitment letter are based upon the facts and assumptions set forth herein and on conditions in the capital markets as they affect Irwin's sources of funds. The terms and conditions shall be subject to adjustment in the event any of the facts or assumptions are incorrect or change prior to the closing of each Loan.

Windram Enterprises, Inc
CCAN 21220
February 8, 2007
Page 7 of 17

**Financial Compliance:**    During the term of the Loan, Borrower and Corporate Guarantors shall maintain a Cash Flow to Fixed Charges Ratio ("Fixed Charge Coverage Ratio" "FCCR") on a consolidated basis of not less than 1.25x for the trailing 12-month performance ("FCCR Compliance"). Borrower and Corporate Guarantors will also be required to provide ~~certified~~ year-end financial statements and other financial information throughout the term of the Loan(s), and Personal Guarantor(s) will be required to provide then current personal financial statements as at the end of each calendar year.

Throughout the term of this Commitment, Borrower and Corporate Guarantors agree to deliver to us quarterly financial statements and other information requested by Irwin, including, within 90 days following the year end, commencing with the last year ending prior to the date of this Commitment, current financial statements for Borrower and each Corporate Guarantor and Personal Guarantor referred to herein. All year-end financial statements shall be certified by the chief financial officer of the respective entity or, in the case of an individual, certified by such individual, as being true and complete copies of said statements.

This Commitment and the closing of the loan(s) contemplated hereby are subject, among other things, to receipt by Irwin at least ten (10) days prior to closing of the Loan(s) of all required documentations, proofs and evidence enumerated herein and as Irwin and its counsel may require.

This Commitment and the transactions contemplated hereby (i) shall be subject to approval of our counsel of all documentation and other requirements set forth herein, (ii) shall be subject to, in our sole judgment, there being no material adverse change in Borrower's financial condition or operating performance, or the financial condition or operating performance of any Guarantor, (iii) shall be subject to closing upon the earlier of [a] thirty (30) days following the opening of the franchise restaurant, or [b] on or before the applicable Outside Date, (iv) shall not be assignable without our prior written consent, and (v) shall be governed by the laws of the State of New York. Irwin reserves the right to cancel this commitment in the event Borrower or any guarantor has made any misrepresentations to Irwin or has withheld any information from Irwin with regard to the transactions contemplated hereby.

*₽40,000 on P/N*

A commitment fee of $92,000.00 ("Commitment Fee") is required with Borrower's execution and acceptance of this letter. Such funds will be credited against the expenses set forth in "Fees and Expenses" hereof, and the balance, if any, will be applied against Borrower's payments due under the Loan(s). Irwin is in receipt of the sum of **$40,000.00** paid as a proposal fee under the proposal letter dated **December 20, 2006** ("Proposal") and this proposal fee has been applied to the Commitment Fee. *P/N* ~~The $52,000.00 remainder of the Commitment Fee is due and payable with this letter.~~ If (i) Borrower fails to complete one or more of the transactions contemplated herein for any reason, or (ii) the conditions of closing set forth herein have not been met, this Commitment shall be deemed withdrawn and the Commitment Fee shall be deemed earned and non-refundable and Borrower will pay all of Irwin's out-of-pocket expenses as provided for herein. In no event shall Irwin's liability for failure to close these transactions exceed a return of the commitment fee. Any disputes arising under this agreement shall be *A.W* litigated only in federal or state court located in New York. *IF CLOSING DATE GOES PAST 3-25-07* *A.W* ~~Borrower Due to Borrowers own performance~~ *performance — Borrower will Then pay TO IRWIN* *A.W* *#2 $50,000*

In the event the Loan(s) has or have not closed or will not close by the applicable Outside Date, Irwin, in *#2 $50,000 TO COVER* its sole discretion, will consider an extension of the applicable Outside Date for a period not to exceed 90 *COST ASSOC* days upon (i) Irwin's receipt of Borrower's written request for such extension, (ii) Irwin's receipt and review *WITH* of then current financial statements for the Borrower and guarantors showing, in Irwin's sole *CLOSING* determination, that [a] no material adverse change has occurred in either the financial condition or operations of such Borrower and guarantors, and [b] Borrower and guarantors have achieved FCCR *AND* Compliance. *MORE IF NEEDED UP TO $92,000 on TOTAL OUTLAY From Borrower*

This Commitment is confidential and is provided solely for Borrower's benefit and shall not be reproduced, distributed, quoted, or otherwise made reference to by Borrower or its guarantors.

*A.W*

*A.W   IRWIN TO PROVIDE DETAIL BREAKDOWN OF COST*
*OUTLAY UPON ADDITIONAL FUNDS REQUEST. A.W)*

Windram Enterprises, Inc
CCAN 21220
February 8, 2007
Page 8 of 17

Please execute the extra copy of this letter acknowledging Borrower's acceptance of the terms hereof. In the event that a copy of this commitment letter, executed by Borrower, is not received by Irwin within ten (10) days of the date hereof, this commitment shall be deemed withdrawn.

This letter cancels and supersedes all previous proposal/commitment letters including but not limited to the letter Proposal dated **December 20, 2006**.

Very truly yours,                         **AGREED AND ACCEPTED**

**Irwin Franchise Capital Corporation**   **WINDRAM ENTERPRISES, INC**
                                          **As Agent for Borrowers**

By:  _____           By:  _____
Name:   Frank LaBrake                     Name:  _____
Title:   Senior Underwriter               Title:  _____
                                          Date:  _____

Windram Enterprises, Inc
CCAN 21220
February 8, 2007
Page 9 of 17

**EXHIBIT B**
**General terms and conditions applicable to all loans**

| | |
|---|---|
| **Corporate Documents:** | Certified copy of Bylaws, Partnership agreement or Operating Agreements as appropriate and good standing certificates |
| **Store Sale/ Change in Control:** | A sale of any collateral for a loan, a change in the controlling interest in Borrower and/or any material change in assets held by Borrower or Guarantors is prohibited without Irwin's consent whose consent will not be unreasonably withheld. |
| **Fees & Expenses:** | Borrower(s) shall pay Irwin's costs and expenses incurred in connection with the documentation and closing of all Loans, including Irwin's counsel fees, all filing and recording fees, Phase I environmental report fees, flood reports, appraisal fees, and all other fees and charges incurred by Irwin. In addition, Borrower shall be responsible for a loan initiation fee of $750.00, and processing fee of $325.00 for each Premises under Transaction 1, and $750.00 for each Premises of Transaction 2 and Transaction 3, which fees will be due and payable at the time of closing and final funding of each loan for such Premises. Irwin is entitled to invoice Borrower for its out-of-pocket costs and expenses and any invoice is due upon receipt. |
| **Survivability:** | The terms and conditions of this Commitment shall survive the closing of the loans and to the extent any such terms and conditions conflict with the loan closing documents, the terms and conditions of the loan closing documents shall control. |
| **Closing Date:** | The closing date for each loan shall mean the date on which (i) Irwin advances to or for the Borrower's account an amount which, in the aggregate with all other partial advances made to or for the Borrower's account, equals the Maximum Loan Amount referred to herein, and (ii) all other conditions precedent have been satisfied, or the applicable Outside Date(s) stated in this Commitment Letter. |
| ~~**Non-ACH Payments:**~~ | ~~If any payment is not made by ACH, there will be a $50.00 handling charge for each non-ACH payment.~~ *AW.* |
| **Assumptions:** | The amount of the Permanent and Equipment Loan(s) and the terms set forth in this Commitment letter are based upon the facts and assumptions set forth herein and on conditions in the capital markets as they affect Irwin's sources of funds. The terms and conditions shall be subject to adjustment in the event any of the facts or assumptions is incorrect or change prior to the closing of each Loan. |
| **Additional Documentation & Provisions:** | This Commitment and the closing of the Loan, unless otherwise indicated, are subject to Irwin's receipt at least ten (10) days prior to the Closing Date of: |

i. Such opinions of Borrower's counsel; certificates, waivers, releases, Uniform Commercial Code Financing Statements and further documents which may be required by Irwin or its counsel.

Windram Enterprises, Inc
CCAN 21220
February 8, 2007
Page 10 of 17

ii. Real Property appraisal shall be performed by an appraiser acceptable to Irwin, and engaged by Irwin. If the asset value contained in the appraisal ("Appraised Value") is less than the Loan Amount, the Loan Amount shall be reduced to no more than eighty five percent (85%) of such Appraised Value.

iii.     Survey—An ALTA/ACSM Land Title Boundary survey required for acquisition of raw land and an As Built ALTA/ACSM Land Title Survey upon completion of construction, each of which shall be certified to Irwin and Title Company. If the real property is already improved, then an As Built ALTA/ACSM Land Title Survey for the Premises, the effective date of which is not greater than sixty (60) days prior to the Closing Date, and which shall be certified to Irwin and the Title Company. All surveys shall be prepared with the Minimum Standards Detail Requirement of ALTA/ACSM appropriate for the type of survey being prepared.

iv.     Environmental report(s), as Irwin may require and which are acceptable to Irwin and in its sole determination, relating to the environmental condition of the Premises, including a Phase I environmental assessment prepared in accordance with the American Society of Testing and Materials guidelines as contained in ASTM E 1527-00. Such report(s) must also be dated within six months prior to the Closing Date.

v.     Borrower shall further provide certification that the Premises is not located in a floodplain, or, in the alternative, evidence of federal flood plain insurance.

vi.     Certificate of Occupancy for the Premises, and satisfactory evidence of waiver of all mechanics' liens.

vii.     Proof of payment of all taxes with respect to the Premises owing through the Closing Date.

viii.     Paid title insurance policy ("Title Policy"), in the American Land Title Association format, acceptable to the Irwin's counsel in the total amount of the loan(s) for the real property. The Title Policy shall contain: (a) full coverage of mechanics's liens, and (b) no survey exceptions.

ix.     Policies of insurance, issued by insurers acceptable to Irwin, that evidence insurance coverage for the Premises, Improvements and Equipment for (a) all risk of loss and damage in dollar amounts not less than the replacement value of such insured property, and further naming Irwin as a loss payee with long form lender's endorsement, (b) public liability and property damage, (c) business interruption insurance, and (d) liquor liability, if applicable, with all such insurance coverage in amounts acceptable to Irwin and which name Irwin as an additional insured.

x.     Satisfactory evidence of the issuance of a franchise license to Borrower from Borrower's franchisor(s). The term of each franchise license for the Premises must be at least equal to or greater than the term of each Loan contemplated herein, as measured from the date of the closing of such Loan(s).

Windram Enterprises, Inc
CCAN 21220
February 8, 2007
Page 11 of 17

 xi.  Executed copies of the land lease that reflects a remaining term
greater than the Leasehold Mortgage term, and satisfactory subordination
and non-disturbance agreements from the fee mortgagee and landowner.
(LEASEHOLD MORTGAGES ONLY)

Windram Enterprises, Inc
CCAN 21220
February 8, 2007
Page 12 of 17

**EXHIBIT C**

**SPECIAL TERMS AND CONDITIONS**

**Transaction 1 Loan(s)**
**Prepayment:**

Following the 42-month period immediately following the close of the Transaction 1 Loan(s), during which time such Loans may not be prepaid, the Transaction 1 Loan(s) may be prepaid in entirety subject to the following conditions:

    (a)  No default by Borrower under any agreement between Borrower and us as lender,

    (b)  No event which, with the passage of time or giving of the notice, or both, would constitute such a default, and

    (c)  Borrower pays us all accrued but unpaid amounts to the prepayment date, all other amounts owed by Borrower under the Loan Documents, whether then due or not, plus a prepayment fee equal to the greater of the following A or B methods of calculation:

| Loan Period | Prepayment Fee as a Percentage Of Loan Principal Outstanding: |
|---|---|
| Months 1 – 42 | No prepayment allowed |
| Thereafter | 2.00% |

*[handwritten:] WITHOUT IRWINS WRITTEN PERMISSION WHICH WILL NOT BE UNREASONABLY WITHHELD. (DUE TO DEATH OR SALE) A.W*

**Transaction 2 Loan(s)**
**Prepayment:**

Following the 60-month period immediately following the close of the Transaction 2 Loan(s), during which time such Loans may not be prepaid, the Transaction 2 Loan(s) may be prepaid in entirety subject to the following conditions:

    (d)  No default by Borrower under any agreement between Borrower and us as lender,

    (e)  No event which, with the passage of time or giving of the notice, or both, would constitute such a default, and

    (f)  Borrower pays us all accrued but unpaid amounts to the prepayment date, all other amounts owed by Borrower under the Loan Documents, whether then due or not, plus a prepayment fee equal to the greater of the following A or B methods of calculation:

| | Loan Period | Prepayment Fee as a Percentage Of Loan Principal Outstanding: |
|---|---|---|
| | Months 1 – 60 | No prepayment allowed |
| [A] | Thereafter | 2.00% |

*[handwritten:] WITHOUT IRWINS WRIT PERMISSION WHICH WILL BE UNREASONABLY WIH (DUE TO DEATH OR SALE) A.W*

                                  **OR**

[B]    A prepayment fee calculated in accordance with Yield Maintenance. The Yield Maintenance amount is the difference between the present value of the remaining monthly payments discounted at the comparable term U.S. Dollar Interest Rate Swaps ("SWAP") (as published in Federal Reserve Statistical Release H.15 [519] at http://www.federalreserve.gov/releases/h15/update/ as of the date of

Windram Enterprises, Inc
CCAN 21220
February 8, 2007
Page 13 of 17

the Loan(s) closing, and the present value of the remaining monthly payments calculated at the comparable SWAP rate for the remaining term, as of the prepayment date.

**Transaction 3 Loan(s)
Prepayment:**

Following the 90-month period immediately following the close of the Transaction 3 Loan(s), during which time such Loans may not be prepaid, the Transaction 3 Loan(s) may be prepaid in entirety subject to the following conditions:

(g) No default by Borrower under any agreement between Borrower and us as lender,

(h) No event which, with the passage of time or giving of the notice, or both, would constitute such a default, and

(i) Borrower pays us all accrued but unpaid amounts to the prepayment date, all other amounts owed by Borrower under the Loan Documents, whether then due or not, plus a prepayment fee equal to the greater of the following A or B methods of calculation:

|   | Loan Period | Prepayment Fee as a Percentage Of Loan Principal Outstanding: |
|---|---|---|
|   | Months 1 ~ 90 | No prepayment allowed |
| [A] | Thereafter | 2.00% |

*(handwritten:) WITHOUT IRWINS WHI PERMISSION WHICH W NOT BE UNREASONA WITHHELD. AN (Due to Death or sale)*

**OR**

[B] A prepayment fee calculated in accordance with Yield Maintenance. The Yield Maintenance amount is the difference between the present value of the remaining monthly payments discounted at the comparable term U.S. Dollar Interest Rate Swaps ("SWAP") (as published in Federal Reserve Statistical Release H.15 [519] at http://www.federalreserve.gov/releases/h15/update/ as of the date of the Loan(s) closing, and the present value of the remaining monthly payments calculated at the comparable SWAP rate for the remaining term, as of the prepayment date.

Windram Enterprises, Inc
CCAN 21220
February 8, 2007
Page 15 of 17

## Exhibit D

## Transaction 1

| Transaction 1 Borrower | Transaction 1 Premises | Allocation of Maximum Loan Amount |
|---|---|---|
| KFC of Peekskill, Inc | Beach Shopping Center, Route 6, Peekskill, NY 12564 | $250,000 |
| Windram Management Corp | Routes 376 and 82, Hopewell Junction, NY 12533 | 200,000 |
| KFC of Yorktown, Inc | 366 Downing Drive, Yorktown Heights, NY 10598 | 200,000 |
| KFC of Pawling, Inc | Route 22 Plaza, Pawling, NY 12564 | 700,000 |
| F Windram Corp | 4301 North Main Street, Bridgeport, CT 06606 | 250,000 |
| ARW Corporation | 1322 Barnum Avenue, Stratford, CT 06497 | 250,000 |
| FRAN Corporation | 717 Lakewood Road, Waterbury, CT 06704 | 250,000 |
| A Windram Corp | 649 West Main Street, Waterbury, CT 06702 | 250,000 |
| Naugatuck Quality Foods, Inc | Bridge Shopping Center, 115 Bridge St, Naugatuck, CT 06770 | 250,000 |
| Bridgeport Express Foods | 983 Main Street, Bridgeport, CT 06601 | 350,000 |
| Transaction 1 Maximum Loan Amount | | $2,950,000 |

Windram Enterprises, Inc
CCAN 21220
February 8, 2007
Page 16 of 17

# Exhibit E

## Transaction 2

| Transaction 2 Borrower | Transaction 2 Premises | Allocation of Maximum Loan Amount Equal to Lesser of [1] 85% of appraised value or [2] the following allocation: |
|---|---|---|
| KFC of Peekskill, Inc | Beach Shopping Center, Route 6, Peekskill, NY 12564 | $750,000 |
| KFC of Carmel, Inc | 1891 Route 6, Carmel, NY 10516 | 750,000 |
| F Windram Corp | 4301 North Main Street, Bridgeport, CT 06606 | 500,000 |
| ARW Corporation | 1322 Barnum Avenue, Stratford, CT 06497 | 500,000 |
| FRAN Corporation | 717 Lakewood Road, Waterbury, CT 06704 | 500,000 |
| A Windram Corp | 649 West Main Street, Waterbury, CT 06702 | 500,000 |
| Naugatuck Quality Foods, Inc | Bridge Shopping Center, 115 Bridge St, Naugatuck, CT 06770 | 500,000 |
| **Transaction 2 Maximum Loan Amount** | | **$4,000,000** |

Windram Enterprises, Inc
CCAN 21220
February 8, 2007
Page 17 of 17

**Exhibit F**

**Transaction 3**

| Transaction 3 Borrower | Transaction 3 Premises | Allocation of Maximum Loan Amount Equal to Lesser of [1] 85% of appraised value or [2] the following allocation: |
|---|---|---|
| A & F Windram Corp | 325 Boston Avenue, Bridgeport, CT 06610 | $1,125,000 |
| Patrick & Helen Corp | 480 Boston Post Road, Orange, CT 06477 | 1,125,000 |
| **Transaction 3 Maximum Loan Amount** | | **$2,250,000** |

**EXHIBIT G**



February 9, 2007

Arthur Windram
Windram Enterprises, Inc.
P.O. Box 374
Pawling, NY 12564

Dear Mr. Windram:

Irwin Franchise Capital Corporation ("Irwin") is pleased to commit to you subject to all the terms and conditions herein ("Commitment Letter"); and the satisfactory receipt of all documents requested in form and substance, to enter into the following financing arrangements ("Loans") in an aggregate amount of $9,200,00.00 with respect to the franchised KFC restaurants detailed herein.  The proceeds of such Loans will provide [1] funds necessary to payoff in full obligations payable by Windram Enterprises, Inc and its wholly owned operating affiliates to General Electric Franchise Finance, including prepayment fees that relate to the pay-off of such obligations, [2] funds necessary to pay the aggregated cost relating to the closing of the Loans, and [3] funds that will be used for general corporate purposes.  The general terms and conditions of the Loans are set forth under the following identified Transaction 1, Transaction 2, and Transaction 3, and in the attached Exhibit B, and Special Terms and Conditions of the Loans are set forth in Exhibit C, each attached hereto and made a part hereof.

## TRANSACTION 1

**Transaction 1
Borrowers:**            The Transaction 1 Borrowers are identified in **Exhibit D**, attached hereto and made a part hereof.

**Maximum
Loan Proceeds**         **$2,950,000.00**, which will be allocated to the individual Transaction 1 Borrowers, and in such amounts ("Transaction 1 Loan(s)"), as outlined in such Exhibit D.

**Loan Term:**          **84 months.**

**Monthly Payment
Factor:**               **0.0156745** for the Transaction 1 Loans, inclusive of interest (adjusted as provided herein).

**Monthly Payment**     **$46,239.90** in the aggregate for the Transaction 1 Loans, which will be paid to Irwin in advance in equal monthly installments of principal and interest applied first to interest and the balance to principal.  Payments will be made by automatic bank debit ("ACH") from borrowers' designated checking account (see attached form).

**Origination Fee:**    A fee of one-half of one percent (0.50%) of the Maximum Loan Amount payable at closing.

an Irwin Financial Company

Windram Enterprises, Inc
CCAN 21220
February 9, 2007
Page 2 of 17

| | |
|---|---|
| **Transaction 1 Index:** | If immediately preceding the closing of the Transaction 1 Loan(s) contemplated herein, the transfer rate charged Irwin by Irwin Union Bank and Trust Company exceeds **5.277%** (the "Index"), the Monthly Payment Factor and Monthly Payments shall be increased based on **290** basis points above the Index, but in no event more than the maximum permitted by law. The Monthly Payment Factor shall not be less than the Monthly Payment Factor stated in this Commitment Letter. |
| **Closing Date:** | The closing shall be no later than **April 30, 2007, however, Borrower and Irwin will use best efforts to close by March 31, 2007** ("Transaction 1 Outside Date"). |
| **Security for Transaction 1 Loans:** | The following will serve as collateral for the Transaction 1 Loans: |

1.  First security interest in the furniture, fixtures, equipment, and tenant improvements located at each of the Transaction 1 Premises, as are identified on the attached Exhibit D, and used in the operation of such Transaction 1 Premises ("Transaction 1 Equipment").
2.  An assignment of KFC of Pawling, Inc's interest as tenant under the ground lease for the premises of the KFC of Pawling, Inc store.
3.  All Loans shall be cross-collateralized and cross-defaulted with all obligations payable to Irwin by the herein identified Transaction 1 Borrowers, Transaction 2 Borrowers, and Transaction 3 Borrowers.

| | |
|---|---|
| **Corporate Guarantors:** | All of the Transaction 1 Borrowers' obligations to Irwin shall be unconditionally guaranteed by all entities that are affiliated with the Transaction 1 Borrowers' common officers, directors, and/or stakeholders including but not limited to: |

| | |
|---|---|
| Windram Enterprises, Inc | A & F Windram Corp |
| ARJ Management Corp | ARW Corporation |
| KFC of Carmel, Inc | F Windram Corp |
| KFC of Pawling, Inc | FRAN Corporation |
| KFC of Peekskill, Inc | Patrick & Helen Corp |
| Windram Management Corp | Naugatuck Quality Foods, Inc |
| KFC of Yorktown, Inc | Bridgeport Express Foods |
| A Windram Corp | |

| | |
|---|---|
| **Personal Guarantor:** | All of the Transaction 1 **Borrowers'** obligations to Irwin shall be unconditionally guaranteed by **Arthur Windram**. |

[Intentionally blank]

Windram Enterprises, Inc
CCAN 21220
February 9, 2007
Page 3 of 17

## TRANSACTION 2

**Transaction 2
Borrowers:**        The Transaction 2 Borrowers are identified in **Exhibit E**, attached hereto and made a part hereof.

**Appraisal Condition:**    Prior to the funding of the Transaction 2 Loans Irwin must be in receipt of an "as built" appraisal for each of the Transaction 2 Premises, as are identified in Exhibit E.

**Maximum
Loan Proceeds**      The aggregate Transaction 2 Maximum Loan Proceeds will be equal to the lesser of:

        [1]    **$4,000,000.00**, which will be allocated to the individual Transaction 2 Borrowers, and in such amounts ("Transaction 2 Loan(s)"), as outlined in Exhibit E, or

        [2]    **85.00%** of the "as built" appraised value of each of the Transaction 2 Premises. The Transaction 2 Maximum Loan Proceeds of each Transaction 2 Loan will not exceed 85.00% of the "as built" appraised value of the corresponding Transaction 2 Premises.

**Loan Term:**          **120 months ("Loan Term"), with Monthly Payments based upon a 180-month amortization period.**

**Monthly Payment
Factor:**           **0.0096236** for the Transaction 2 Loans, inclusive of interest (adjusted as provided herein).

**Monthly Payment**      The **$38,494.43** aggregate monthly payment for the Transaction 2 Loans will be paid to Irwin in arrears in equal monthly installments of principal and interest applied first to interest and the balance to principal, with a balloon payment of principal then outstanding at the maturity of the Loan Term. Payments will be made by automatic bank debit ("ACH") from borrowers' designated checking account (see attached form).

**Origination Fee:**      A fee of one-half of one percent (0.50%) of the Maximum Loan Amount payable at closing.

**Transaction 2 Index:**  If immediately preceding the closing of the Transaction 2 Loan(s) contemplated herein, the transfer rate charged Irwin by Irwin Union Bank and Trust Company exceeds **5.366%** (the "Index"), the Monthly Payment Factor and Monthly Payments shall be increased based on **275** basis points above the Index, but in no event more than the maximum permitted by law. The Monthly Payment Factor shall not be less than the Monthly Payment Factor stated in this Commitment Letter.

**Closing Date:**       The closing shall be no later than **April 30, 2007**, however, Borrower and Irwin will use best efforts to close by **March 31, 2007** ("Transaction 2 Outside Date").

· Windram Enterprises, Inc
CCAN 21220
February 9, 2007
Page 5 of 17

## TRANSACTION 3

**Transaction 3
Borrowers:**  The Transaction 3 Borrowers are identified in **Exhibit F**, attached hereto and made a part hereof.

**Appraisal Condition:**  Prior to the funding of the Transaction 3 Loans Irwin must be in receipt of an "as built" appraisal for each of the Transaction 3 Premises, as are identified in Exhibit F.

**Maximum
Loan Proceeds**  The aggregate Transaction 3 Maximum Loan Proceeds will be equal to the lesser of:

[1]  **$2,250,000.00**, which will be allocated to the individual Transaction 3 Borrowers, and in such amounts ("Transaction 3 Loan(s)"), as outlined in Exhibit F, or

[2]  **85.00%** of the "as built" appraised value of the Transaction 3 Premises. The Transaction 3 Maximum Loan Proceeds of each Transaction 3 Loan will not exceed 85.00% of the "as built" appraised value of the corresponding Transaction 3 Premises.

**Loan Term:**  **120 months ("Loan Term"), with Monthly Payments based upon a 240-month amortization period.**

**Monthly Payment
Factor:**  **0.0084442** for the Transaction 3 Loans, inclusive of interest (adjusted as provided herein).

**Monthly Payment**  The **$18,999.53** aggregate monthly payment for the Transaction 3 Loans will be paid to Irwin in arrears in equal monthly installments of principal and interest applied first to interest and the balance to principal, with a balloon payment of principal then outstanding at the maturity of the Loan Term. Payments will be made by automatic bank debit ("ACH") from borrowers' designated checking account (see attached form).

**Origination Fee:**  A fee of one-half of one percent (0.50%) of the Maximum Loan Amount payable at closing.

**Transaction 3 Index:**  If immediately preceding the closing of the Transaction 3 Loan(s) contemplated herein, the transfer rate charged Irwin by Irwin Union Bank and Trust Company exceeds 5.378% (the "Index"), the Monthly Payment Factor and Monthly Payments shall be increased based on 275 basis points above the Index, but in no event more than the maximum permitted by law. The Monthly Payment Factor shall not be less than the Monthly Payment Factor stated in this Commitment Letter.

**Closing Date:**  The closing shall be no later than **April 30, 2007, however, Borrower and Irwin will use best efforts to close by March 31, 2007** ("Transaction 3 Outside Date").

Windram Enterprises, Inc
CCAN 21220
February 9, 2007
Page 6 of 17

**Security for**
**Transaction 3 Loans:**   The following will serve as collateral for the Transaction 3 Loans:

1.  First mortgage lien as against the real property associated with the Transaction 3 Premises.
2.  First security interest in the furniture, fixtures, equipment, and tenant improvements located at the Transaction 3 Premises and used in the operation of such Transaction 3 Premises ("Transaction 3 Equipment").
3.  All Loans shall be cross-collateralized and cross-defaulted with all obligations payable to Irwin by the herein identified Transaction 1 Borrowers, Transaction 2 Borrowers, and Transaction 3 Borrowers.

**Corporate Guarantors:**   All of the Transaction 3 Borrowers' obligations to Irwin shall be unconditionally guaranteed by all entities that are affiliated with the Transaction 3 Borrowers' common officers, directors, and/or stakeholders including but not limited to:

| | |
|---|---|
| Windram Enterprises, Inc | A & F Windram Corp |
| ARJ Management Corp | ARW Corporation |
| KFC of Carmel, Inc | F Windram Corp |
| KFC of Pawling, Inc | FRAN Corporation |
| KFC of Peekskill, Inc | Patrick & Helen Corp |
| Windram Management Corp | Naugatuck Quality Foods, Inc |
| KFC of Yorktown, Inc | Bridgeport Express Foods |
| A Windram Corp | |

**Personal Guarantor:**   All of the Transaction 3 **Borrowers'** obligations to Irwin shall be unconditionally guaranteed by **Arthur Windram.**


**HEREINAFTER, UNLESS OTHERWISE NOTED:**

**THE TRANSACTION 1 BORROWERS, TRANSACTION 2 BORROWERS, AND TRANSACTION 3 BORROWERS SHALL BE REFERRED TO AS "BORROWER",**

**THE TRANSACTION 1 LOANS, TRANSACTION 2 LOANS, AND TRANSACTION 3 LOANS SHALL BE REFERRED TO AS THE "LOANS",**

**THE TRANSACTION 1 PREMISES, TRANSACTION 2 PREMISES, AND TRANSACTION 3 PREMISES SHALL BE REFERRED TO AS THE "PREMISES",**

**THE TRANSACTION 1 EQUIPMENT, TRANSACTION 2 EQUIPMENT, AND TRANSACTION 3 EQUIPMENT SHALL BE REFERRED TO AS THE "EQUIPMENT".**


**THE FOLLOWING TERMS AND CONDITIONS SHALL PERTAIN TO TRANSACTION 1, TRANSACTION 2, AND TRANSACTION 3**

**Assumptions:**   The amount of the Loan(s) and the terms set forth in this Commitment letter are based upon the facts and assumptions set forth herein and on conditions in the capital markets as they affect Irwin's sources of funds.  The terms and

Windram Enterprises, Inc
CCAN 21220
February 9, 2007
Page 7 of 17

conditions shall be subject to adjustment in the event any of the facts or assumptions are incorrect or change prior to the closing of each Loan.

**Financial Compliance:**     During the term of the Loan, Borrower and Corporate Guarantors shall maintain a Cash Flow to Fixed Charges Ratio ("Fixed Charge Coverage Ratio" "FCCR") on a consolidated basis of not less than 1.25x for the trailing 12-month performance ("FCCR Compliance"). Borrower and Corporate Guarantors will also be required to provide accountant reviewed and compiled year-end financial statements and other financial information throughout the term of the Loan(s), and Personal Guarantor(s) will be required to provide then current personal financial statements as at the end of each calendar year.

Throughout the term of this Commitment, Borrower and Corporate Guarantors agree to deliver to us quarterly financial statements and other information requested by Irwin, including, within 90 days following the year end, commencing with the last year ending prior to the date of this Commitment, current financial statements for Borrower and each Corporate Guarantor and Personal Guarantor referred to herein. All year-end financial statements shall be certified by the chief financial officer of the respective entity or, in the case of an individual, certified by such individual, as being true and complete copies of said statements.

This Commitment and the closing of the loan(s) contemplated hereby are subject, among other things, to receipt by Irwin at least ten (10) days prior to closing of the Loan(s) of all required documentations, proofs and evidence enumerated herein and as Irwin and its counsel may require

This Commitment and the transactions contemplated hereby (i) shall be subject to approval of our counsel of all documentation and other requirements set forth herein, (ii) shall be subject to, in our sole judgment, there being no material adverse change in Borrower's financial condition or operating performance, or the financial condition or operating performance of any Guarantor, (iii) shall be subject to closing upon the earlier of [a] thirty (30) days following the opening of the franchise restaurant, or [b] on or before the applicable Outside Date, (iv) shall not be assignable without our prior written consent, and (v) shall be governed by the laws of the State of New York. Irwin reserves the right to cancel this commitment in the event Borrower or any guarantor has made any misrepresentations to Irwin or has withheld any information from Irwin with regard to the transactions contemplated hereby.

A commitment fee of **$92,000.00** ("Commitment Fee") is required with Borrower's execution and acceptance of this letter. Such funds will be credited against the expenses set forth in "Fees and Expenses" hereof, and the balance, if any, will be applied against Borrower's payments due under the Loan(s). Irwin is in receipt of the sum of **$40,000.00** paid as a proposal fee under the proposal letter dated **December 20, 2006** ("Proposal") and this proposal fee has been applied to the Commitment Fee. The **$52,000.00** remainder of the Commitment Fee will be paid to Irwin as follows: **$26,000.00 on February 28, 2007 and $26,000.00 on March 15, 2007.** Irwin will support offsetting costs relating to such Commitment Fee with invoices of third party service providers that have been engaged by Irwin on behalf of Borrower for processing requirements of the Loans. If (i) Borrower fails to complete one or more of the transactions contemplated herein for any reason, or (ii) the conditions of closing set forth herein have not been met, this Commitment shall be deemed withdrawn and the Commitment Fee shall be deemed earned and non-refundable and Borrower will pay all of Irwin's out-of-pocket expenses as provided for herein. In no event shall Irwin's liability for failure to close these transactions exceed a return of the commitment fee. Any disputes arising under this agreement shall be litigated only in federal or state court located in New York.

In the event the Loan(s) has or have not closed or will not close by the applicable Outside Date, Irwin, in its sole discretion, will consider an extension of the applicable Outside Date for a period not to exceed 90 days upon (i) Irwin's receipt of Borrower's written request for such extension, (ii) Irwin's receipt and review of then current financial statements for the Borrower and guarantors showing, in Irwin's sole determination, that [a] no material adverse change has occurred in either the financial condition or

Windram Enterprises, Inc
CCAN 21220
February 9, 2007
Page 8 of 17

operations of such Borrower and guarantors, and [b] Borrower and guarantors have achieved FCCR Compliance.

This Commitment is confidential and is provided solely for Borrower's benefit and shall not be reproduced, distributed, quoted, or otherwise made reference to by Borrower or its guarantors.

Please execute the extra copy of this letter acknowledging Borrower's acceptance of the terms hereof. In the event that a copy of this commitment letter, executed by Borrower, is not received by Irwin within ten (10) days of the date hereof, this commitment shall be deemed withdrawn.

This letter cancels and supersedes all previous proposal/commitment letters including but not limited to the letters dated **December 20, 2006 and February 8, 2007**.

Very truly yours,                              **AGREED AND ACCEPTED**

**Irwin Franchise Capital Corporation**        **WINDRAM ENTERPRISES, INC**
                                               **As Agent for Borrowers**

By: _____                    By: _____

Name:    Frank LaBrake                         Name: _____
Title:   Senior Underwriter                             Anthur Winain

                                               Title: _____
                                                            pres

                                               Date: _____
                                                          2-11-2007

Windram Enterprises, Inc
CCAN 21220
February 9, 2007
Page 9 of 17

## EXHIBIT B
### General terms and conditions applicable to all loans

| | |
|---|---|
| **Corporate Documents:** | Certified copy of Bylaws, Partnership agreement or Operating Agreements as appropriate and good standing certificates |
| **Store Sale/ Change in Control:** | A sale of any collateral for a loan, a change in the controlling interest in Borrower and/or any material change in assets held by Borrower or Guarantors is prohibited without Irwin's consent whose consent will not be unreasonably withheld. |
| **Fees & Expenses:** | Borrower(s) shall pay Irwin's costs and expenses incurred in connection with the documentation and closing of all Loans, including Irwin's counsel fees, all filing and recording fees, Phase I environmental report fees, flood reports, appraisal fees, and all other fees and charges incurred by Irwin. In addition, Borrower shall be responsible for a loan initiation fee of $750.00, and processing fee of $325.00 for each Premises under Transaction 1, and $750.00 for each Premises of Transaction 2 and Transaction 3, which fees will be due and payable at the time of closing and final funding of each loan for such Premises. Irwin is entitled to invoice Borrower for its out-of-pocket costs and expenses and any invoice is due upon receipt. |
| **Survivability:** | The terms and conditions of this Commitment shall survive the closing of the loans and to the extent any such terms and conditions conflict with the loan closing documents, the terms and conditions of the loan closing documents shall control. |
| **Closing Date:** | The closing date for each loan shall mean the date on which (i) Irwin advances to or for the Borrower's account an amount which, in the aggregate with all other partial advances made to or for the Borrower's account, equals the Maximum Loan Amount referred to herein, and (ii) all other conditions precedent have been satisfied, or the applicable Outside Date(s) stated in this Commitment Letter. |
| **Non-ACH Payments:** | ACH payments will not be required. |
| **Assumptions:** | The amount of the Permanent and Equipment Loan(s) and the terms set forth in this Commitment letter are based upon the facts and assumptions set forth herein and on conditions in the capital markets as they affect Irwin's sources of funds. The terms and conditions shall be subject to adjustment in the event any of the facts or assumptions is incorrect or change prior to the closing of each Loan. |
| **Additional Documentation & Provisions:** | This Commitment and the closing of the Loan, unless otherwise indicated, are subject to Irwin's receipt at least ten (10) days prior to the Closing Date of: |
| | i. Such opinions of Borrower's counsel; certificates, waivers, releases, Uniform Commercial Code Financing Statements and further documents which may be required by Irwin or its counsel. |

Windram Enterprises, Inc
CCAN 21220
February 9, 2007
Page 10 of 17

ii. Real Property appraisal shall be performed by an appraiser acceptable to Irwin, and engaged by Irwin. If the asset value contained in the appraisal ("Appraised Value") is less than the Loan Amount, the Loan Amount shall be reduced to no more than eighty five percent (85%) of such Appraised Value.

iii.     Survey—An ALTA/ACSM Land Title Boundary survey required for acquisition of raw land and an As Built ALTA/ACSM Land Title Survey upon completion of construction, each of which shall be certified to Irwin and Title Company. If the real property is already improved, then an As Built ALTA/ACSM Land Title Survey for the Premises, the effective date of which is not greater than sixty (60) days prior to the Closing Date, and which shall be certified to Irwin and the Title Company. All surveys shall be prepared with the Minimum Standards Detail Requirement of ALTA/ACSM appropriate for the type of survey being prepared.

iv.     Environmental report(s), as Irwin may require and which are acceptable to Irwin and in its sole determination, relating to the environmental condition of the Premises, including a Phase I environmental assessment prepared in accordance with the American Society of Testing and Materials guidelines as contained in ASTM E 1527-00. Such report(s) must also be dated within six months prior to the Closing Date.

v.     Borrower shall further provide certification that the Premises is not located in a floodplain, or, in the alternative, evidence of federal flood plain insurance.

vi.     Certificate of Occupancy for the Premises, and satisfactory evidence of waiver of all mechanics' liens.

vii.     Proof of payment of all taxes with respect to the Premises owing through the Closing Date.

viii.     Paid title insurance policy ("Title Policy"), in the American Land Title Association format, acceptable to the Irwin's counsel in the total amount of the loan(s) for the real property. The Title Policy shall contain: (a) full coverage of mechanics's liens, and (b) no survey exceptions.

ix.     Policies of insurance, issued by insurers acceptable to Irwin, that evidence insurance coverage for the Premises, Improvements and Equipment for (a) all risk of loss and damage in dollar amounts not less than the replacement value of such insured property, and further naming Irwin as a loss payee with long form lender's endorsement, (b) public liability and property damage, (c) business interruption insurance, and (d) liquor liability, if applicable, with all such insurance coverage in amounts acceptable to Irwin and which name Irwin as an additional insured.

x.     Satisfactory evidence of the issuance of a franchise license to Borrower from Borrower's franchisor(s). The term of each franchise license for the Premises must be at least equal to or greater than the term of each Loan contemplated herein, as measured from the date of the closing of such Loan(s).

Windram Enterprises, Inc
CCAN 21220
February 9, 2007
Page 11 of 17

      xi.     Executed copies of the land lease that reflects a remaining term greater than the Leasehold Mortgage term, and satisfactory subordination and non-disturbance agreements from the fee mortgagee and landowner. (LEASEHOLD MORTGAGES ONLY)

Windram Enterprises, Inc
CCAN 21220
February 9, 2007
Page 12 of 17

## EXHIBIT C

### SPECIAL TERMS AND CONDITIONS

**Transaction 1 Loan(s)**
**Prepayment:**

Following the 42-month period immediately following the close of the Transaction 1 Loan(s), during which time such Loans may not be prepaid, the Transaction 1 Loan(s) may be prepaid in entirety subject to the following conditions:

(a) No default by Borrower under any agreement between Borrower and us as lender,

(b) No event which, with the passage of time or giving of the notice, or both, would constitute such a default, and

(c) Borrower pays us all accrued but unpaid amounts to the prepayment date, all other amounts owed by Borrower under the Loan Documents, whether then due or not, plus a prepayment fee equal to the greater of the following A or B methods of calculation:

| Loan Period | Prepayment Fee as a Percentage Of Loan Principal Outstanding: |
|---|---|
| Months 1 – 42 | No prepayment allowed |
| Thereafter | 2.00% |

**Transaction 2 Loan(s)**
**And Transaction 3 Loan(s)**
**Prepayment:**

Following the 60-month period immediately following the close of the Transaction 2 Loan(s) and Transaction 3 Loan(s), during which time such Loans may not be prepaid, the Transaction 2 Loan(s) and Transaction 3 Loan(s) may be prepaid in entirety subject to the following conditions:

(d) No default by Borrower under any agreement between Borrower and us as lender,

(e) No event which, with the passage of time or giving of the notice, or both, would constitute such a default, and

(f) Borrower pays us all accrued but unpaid amounts to the prepayment date, all other amounts owed by Borrower under the Loan Documents, whether then due or not, plus a prepayment fee equal to the greater of the following A or B methods of calculation:

| | Loan Period | Prepayment Fee as a Percentage Of Loan Principal Outstanding: |
|---|---|---|
| | Months 1 – 60 | No prepayment allowed |
| [A] | Thereafter | 2.00% |

### OR

[B]    A prepayment fee calculated in accordance with Yield Maintenance. The Yield Maintenance amount is the difference between the present value of the remaining monthly payments discounted at the comparable term U.S. Dollar interest Rate Swaps ("SWAP") (as published in Federal Reserve Statistical Release H.15 [519] at

Windram Enterprises, Inc
CCAN 21220
February 9, 2007
Page 13 of 17

http://www.federalreserve.gov/releases/h15/update/ as of the date of
the Loan(s) closing, and the present value of the remaining monthly
payments calculated at the comparable SWAP rate for the remaining
term, as of the prepayment date.

Notwithstanding the above provisions, in the event of Arthur Windram's death, irrespective of date, there
will be no required prepayment fee.

Windram Enterprises, Inc
CCAN 21220
February 9, 2007
Page 15 of 17

## Exhibit D

## Transaction 1

| Transaction 1 Borrower | Transaction 1 Premises | Allocation of Maximum Loan Amount |
|---|---|---|
| KFC of Peekskill, Inc | Beach Shopping Center, Route 6, Peekskill, NY 12564 | $250,000 |
| Windram Management Corp | Routes 376 and 82, Hopewell Junction, NY 12533 | 200,000 |
| KFC of Yorktown, Inc | 366 Downing Drive, Yorktown Heights, NY 10598 | 200,000 |
| KFC of Pawling, Inc | Route 22 Plaza, Pawling, NY 12564 | 700,000 |
| F Windram Corp | 4301 North Main Street, Bridgeport, CT 06606 | 250,000 |
| ARW Corporation | 1322 Barnum Avenue, Stratford, CT 06497 | 250,000 |
| FRAN Corporation | 717 Lakewood Road, Waterbury, CT 06704 | 250,000 |
| A Windram Corp | 649 West Main Street, Waterbury, CT 06702 | 250,000 |
| Naugatuck Quality Foods, Inc | Bridge Shopping Center, 115 Bridge St, Naugatuck, CT 06770 | 250,000 |
| Bridgeport Express Foods | 983 Main Street, Bridgeport, CT 06601 | 350,000 |
| **Transaction 1 Maximum Loan Amount** | | **$2,950,000** |

Windram Enterprises, Inc
CCAN 21220
February 9, 2007
Page 16 of 17

## Exhibit E

### Transaction 2

| Transaction 2 Borrower | Transaction 2 Premises | Allocation of Maximum Loan Amount Equal to Lesser of [1] 85% of appraised value or [2] the following allocation: |
|---|---|---|
| KFC of Peekskill, Inc | Beach Shopping Center, Route 6, Peekskill, NY 12564 | $750,000 |
| KFC of Carmel. Inc | 1891 Route 6, Carmel, NY 10516 | 750,000 |
| F Windram Corp | 4301 North Main Street, Bridgeport, CT 06606 | 500,000 |
| ARW Corporation | 1322 Barnum Avenue, Stratford, CT 06497 | 500,000 |
| FRAN Corporation | 717 Lakewood Road, Waterbury, CT 06704 | 500,000 |
| A Windram Corp | 649 West Main Street, Waterbury, CT 06702 | 500,000 |
| Naugatuck Quality Foods, Inc | Bridge Shopping Center, 115 Bridge St, Naugatuck, CT 06770 | 500,000 |
| **Transaction 2 Maximum Loan Amount** | | **$4,000,000** |

Windram Enterprises, Inc
CCAN 21220
February 9, 2007
Page 17 of 17

## Exhibit F

## Transaction 3

| Transaction 3 Borrower | Transaction 3 Premises | Allocation of Maximum Loan Amount Equal to Lesser of [1] 85% of appraised value or [2] the following allocation: |
|---|---|---|
| A & F Windram Corp | 325 Boston Avenue, Bridgeport, CT 06610 | $1,125,000 |
| Patrick & Helen Corp | 480 Boston Post Road, Orange, CT 06477 | 1,125,000 |
| **Transaction 3 Maximum Loan Amount** | | **$2,250,000** |

**EXHIBIT H**

## John Klarl

| | |
|---|---|
| **From:** | Karla Ray [kray@ibolaw.com] |
| **Sent:** | Tuesday, February 13, 2007 3:02 PM |
| **To:** | jjklarl@aol.com |
| **Cc:** | Ann Mulderrig |
| **Subject:** | CT counsel for Windram Enterprises, Inc. |

John,

If you are in the process of retaining CT counsel, you may want to contact Rob Accomando. His telephone number is 203-267-3333 and his e-mail address is Rob@nutmeglaw.com.

We have placed the title order through First American Title Insurance Company. Ann Mulderrig of our office will forward the e-mail to you so that you have it for your records.

Thank you.

Karla P. Ray, Esq.
Member
Ivey, Barnum & O'Mara, LLC
170 Mason Street
Greenwich, CT 06830
Tel: 203-661-6000
Fax: 203-661-9462

IRS Circular 230 Disclosure:  Any tax advice contained in this communication (including any attachments or enclosures) was not intended or written to be used, and cannot be used,  for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed in this communication.  (The foregoing disclaimer has been affixed pursuant to U.S. Treasury regulations governing tax practitioners.)

Privileged/Confidential Information:  This message originates from the law firm of Ivey, Barnum & O'Mara, LLC. The message and any file transmitted with it may contain confidential information which may be subject to the attorney-client privilege, or otherwise protected against unauthorized use. Any disclosure, distribution, copying or use of the information by anyone other than the intended recipient, regardless of address or routing, is strictly prohibited.  If you have received this message in error, please advise the sender by immediate reply and delete the original message. Personal messages express views solely of the sender and are not attributable to Ivey, Barnum & O'Mara, LLC.

**EXHIBIT I**

# John Klarl

| | |
|---|---|
| **From:** | Karla Ray [kray@ibolaw.com] |
| **Sent:** | Friday, February 16, 2007 11:59 AM |
| **To:** | jjklarl@aol.com; arwkfc@aol.com |
| **Cc:** | Christine Currens; Nathan Graf; Ann Mulderrig |
| **Subject:** | Updated Due Diligence Summary and Title Order Documents for Conference Call |

In anticipation of today's conference call, attached is an updated Title Order Spreadsheet and Due Diligence Summary.

Karla P. Ray, Esq.
Member
Ivey, Barnum & O'Mara, LLC
170 Mason Street
Greenwich, CT 06830
Tel: 203-661-6000
Fax: 203-661-9462

IRS Circular 230 Disclosure: Any tax advice contained in this communication (including any attachments or enclosures) was not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed in this communication. (The foregoing disclaimer has been affixed pursuant to U.S. Treasury regulations governing tax practitioners.)

Privileged/Confidential Information: This message originates from the law firm of Ivey, Barnum & O'Mara, LLC. The message and any file transmitted with it may contain confidential information which may be subject to the attorney-client privilege, or otherwise protected against unauthorized use. Any disclosure, distribution, copying or use of the information by anyone other than the intended recipient, regardless of address or routing, is strictly prohibited. If you have received this message in error, please advise the sender by immediate reply and delete the original message. Personal messages express views solely of the sender and are not attributable to Ivey, Barnum & O'Mara, LLC.

**ATTORNEY NOTES INTENTIONALLY REDACTED**

Draft: 9/21/2006

**IRWIN FRANCHISE CAPITAL CORPORATION**
**SUMMARY OF PRELIMINARY DUE DILIGENCE REQUIREMENTS**
**FOR LOAN TRANSACTION**
**WITH**
**WINDRAM ENTERPRISES, INC., ET AL.**
**[Draft: 02/16/2007]**

**[Closing Checklist to Follow for Commitment Letter Dated 2/07/2007]**

**Corporate Documentation:**

- Articles of Formation/Incorporation for each Borrower/Guarantor *[IFCC ordered 2/12/2007]*
- Certificates of Good Standing for each Borrower/Guarantor *[IFCC ordered 2/12/2007]*
- Bylaws for each Borrower/Guarantor *[John Klarl to coordinate]*
- Evidence/Confirmation of Ownership Interest for each Borrower/Guarantor *[John Klarl to coordinate]*
- Authorized Signatory of Borrower/Guarantor – Aurther R. Windram, as President [for all entities]

**Site Specific Due Diligence:**

- Legal Description for each site (including the leasehold legal description for all leasehold sites; this is necessary for title work and the completion of the appraisals) *[John Klarl to coordinate]*
- Evidence of Zoning Compliance [may be satisfied by Zoning Endorsement to title policy]
- Title Commitment [required for ground lease/real estate loans only] *[Title work ordered through First American Title Insurance Company on 2/13/2007]*
- Record Owner Search [required for those sites with equipment loans only] *[Record Owner Searches ordered through First American Title Insurance Company on 2/13/2007]*
- ALTA As-Built Survey [required for ground lease/real estate loans only] *[Surveys ordered through The Matthews Company on 2/12/2007]*
- Leases [for all leasehold sites with third party landlords] *[Received all but Hopewell Junction, Yorktown Heights, and 983 Main Street, Bridgeport; Subject to Review]*
- Inter-Company (Sub)Lease for each location (if Borrower and Franchisee/Operator are different entities)
- Memorandum of Lease
- Landlord Estoppel Certificate [for ground lease/real estate loans]
- Landlord Waiver Agreement [for equipment loans only]
- SNDA from each fee mortgage holder for each leasehold site
- Franchise Agreements [for all sites] *[Received All; Subject to Review]*
- Business License/Health Permit/Certificate of Occupancy [Will be required for stores in operation for less than five (5) years]
- GE Pay-off Letters [Borrower to coordinate]

**Other Due Diligence:**

- *Appraisals* – O [In process]
- *Flood Zone Searches* – X [On File with IFCC; All are satisfactory and in Flood Zone X except F Windram Corp. - 4301 North Main Street, Bridgeport, CT (Flood Zone A) – NEED flood insurance; Flood Certification Company is researching as Borrower

Draft: 9/21/2006

does not believe that property is in a flood zone (NEED confirmation of street address (Main Street vs. North Main Street)]

- *Environmental Reports* – X [On File with IFCC; All are satisfactory – no further documentation needed]


- *ACH Debit - O*
- *Environmental Questionnaires* – R [Signed by Borrower only; Need landlord signatures]
- *Insurance Authorization Form* – X [IFCC to follow-up with insurance carrier]

- *Borrower's NY counsel to advise as to name and contact information for local CT counsel*

- *Core loan documents distributed to Borrower's counsel on 2/12/2007.*

- *Discuss NY Mortgage Tax Consequences*


**Closing Logistics:**

- **Funding/Closing will take place via a "mail away" closing. In order to accommodate a March 30th funding date, all documents should be fully executed and returned to IBO for receipt no later than March 19th.**